484 A.2d 159

**COMMONWEALTH of Pennsylvania**

v.

**Russell T. THOMPSON, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 22, 1984.

Filed Nov. 9, 1984.

Petition for Allowance of Appeal Denied May 14, 1985.

Arthur L. Goldberg, Harrisburg, for appellant.

Gregory B. Abeln, Assistant District Attorney, Carlisle, for Commonwealth, appellee.

Before WICKERSHAM, MONTEMURO and MONTGOMERY, JJ.

MONTEMURO, Judge:

This is an appeal from the judgment of sentence of the Court of Common Pleas of Cumberland County. Because we find entrapment as a matter of law, we reverse.

On May 1, 1981, appellant, Russell Thompson, a former Carlisle policeman, was arrested and charged with one count of unlawful delivery of a small amount of marijuana [1] and one count of criminal conspiracy.[2] Appellant was con-

1. 35 Pa.C.S. § 780–113(a)(31).
2. 18 Pa.C.S. § 903.

victed by a jury on both counts on September 23, 1981. After his post-verdict motions requesting a new trial or an arrest of judgment were denied, he was sentenced on the drug conviction to a term of imprisonment of not less than fifteen (15) days nor more than thirty (30) days and was fined fifty dollars; the sentence was suspended generally on the conspiracy conviction. This timely appeal followed.

Appellant raises two issues:

Did the [l]ower [c]ourt err in finding that under the facts in this case the police conduct in the investigation did not constitute entrapment as a matter of law?

Did the lower court err in permitting the Commonwealth to elicit prejudicial, conjectural testimony from the Commonwealth witness?

Brief for appellant at 3.

The first issue, whether the state police conduct in question constituted entrapment as a matter of law, was raised in pre-trial motions, during trial by demurrer following the Commonwealth's case, in post-trial motions, and now on appeal. Appellant does not deny giving Trooper Lucinda Hammond a small amount of marijuana on the evening of March 23, 1981. Rather, he argues that the procurement and delivery of the marijuana were the result of a romantic relationship that developed on the part of the appellant, a relationship brought about by Hammond's conduct over a ten month period. Because we agree with appellant's contention that this conduct constituted entrapment, we need not reach the second issue he has raised.

Beginning on May 1, 1980, state police Trooper Lucinda Hammond became involved in an undercover investigation of appellant,[3] a 46-year-old black male who was married and living with his wife and mentally retarded daughter in Carlisle. At the time this investigation began, he was a ten-year veteran of the Carlisle Borough Police Force.

3. It is not clear from the record why this investigation was ever started. Trooper Hammond's testimony simply states there were "accusations" regarding the appellant.

Trooper Hammond was a young, blonde, white female who apparently was very attractive.

The undercover officer came to Carlisle on May 2, May 9, May 12, May 16, May 22, May 23, May 28, June 5, June 6, June 12, June 19, and June 25 of 1980 in an attempt to make contact with appellant. Although Trooper Hammond was unable to establish any direct communication with appellant, he did wave to her on May 22 and May 28. Her purpose in making contact with appellant on all these occasions was to determine if he would provide her with drugs.

Trooper Hammond's first "face-to-face" contact with appellant was on July 10, 1980 at the square in Carlisle. He was on duty and she approached him with a question about a false temporary driver's license which apparently was used as a pretext for starting a conversation. She testified that at the time her hair was long and straight and she wore mid-thigh cut-off shorts and a short-sleeved jersey. During the conversation which ensued, the two began talking about "partying" and having a good time. Appellant discussed with Hammond his purported use of marijuana and she let him know that she "partied" and "got high." He then told her he would be able to get drugs for her.

The second encounter between appellant and Hammond occurred on August 8, 1980 when she again walked up to him while he was on duty. She was again dressed in cut-offs and a jersey. There was a brief conversation, but no mention of drugs. Sometime after this meeting, Hammond began to telephone appellant at his place of work, the Carlisle Police Station. These calls continued over the course of the investigation, totaling at least eight to ten in all. Appellant never contacted Hammond and she never provided him with a means of doing so.

The third direct contact between them occurred on September 3, 1980, when she again walked up to him while he was working. She wore a blouse that was open in the back and shoulders, as well as her by now standard cut-offs. Appellant recognized her immediately and started a friendly conversation, which included a discussion of drugs and

getting high. He tried to get her to meet him after work at a tavern called the Oliver Plunkett,[4] but she declined and instead arranged to meet him the next night at another tavern called Yancy's.

As had been arranged, they met and had drinks together at Yancy's on September 4. It was their fourth meeting and first date. Again the discussion turned to partying and getting high. Appellant stated to Hammond that he kept marijuana in his locker at work which he would seize during drug arrests and then use himself. This appears to have been mere braggadocio.[5] She asked if he was going to get some of this marijuana and he said no. He repeatedly, on that evening and throughout the investigation, indicated to her that he wanted her to trust him, that he might be a policeman, but he liked fun too. He assured her that he was not trying to set her up.

The fifth direct contact occurred on September 29, after she had called him at the police station. They met again at Yancy's for a date, and she then asked him to obtain some marijuana for her personal use or "maybe make a little money on the side." (N.T., Trial at 28). He responded by again trying to get her to go to the Oliver Plunkett after hours with him, telling her she could get some marijuana if she would go with him. She declined to do so and left Yancy's.

The next and sixth personal contact did not occur until December 17, 1980. She had talked to him, however, on October 23 and 24, and, in another telephone conversation on November 25, had "point blank" asked him if he could make a deal for some drugs. On November 26 and December 3, she traveled to Carlisle looking for appellant but could not find him. At the December 17 meeting, when he

4. Trooper Hammond testified appellant repeatedly told her the Oliver Plunkett was the bar where drugs could easily be gotten after closing time. Despite appellant's constant requests that she meet him there after midnight, and despite her apparent familiarity with the bar, Hammond never went to the tavern with appellant.

5. The record discloses no attempt by the state police to verify whether there was in fact marijuana in appellant's locker, and further, it appears uncontradicted on the record that during his tenure as a police officer, appellant had never even made a drug arrest.

was on duty, she again asked him about getting drugs. As before, he wanted her to meet him after midnight and she would not do so.

She met with him briefly on January 6, 1982 and arranged to meet him at Yancy's the next day. During that date at Yancy's, she began directly indicating to him that he "wasn't coming across" with any drugs. (N.T. Trial at 88). Possibly as early as October or November, but certainly by this date, she began chiding him, telling him he was "all talk" and never produced anything for her. She began to question appellant's ability to obtain drugs for her. He stated he would get some for her if she'd meet him again the next night. They did meet the following night, January 8, 1981, in a furniture store parking lot at the M.J. Carlisle Mall. On this eighth meeting between the two, she got into his car only to find he had no drugs. He indicated he would get them later in the evening, so they went to the Hamilton Lounge together. When she indicated to him she was interested in getting something for herself for later that night, he made no moves to get any drugs, despite having earlier mentioned his "connection" was in the Oliver Plunkett right across the street. Instead, he questioned her about her social life. Before she left, she asked about paying for the drugs, but he assured her the drugs would not cost her anything.

It is clear from the testimony that on or about December 1980 or January 1981, they were kissing at the end of their dates or meetings, either at her car or while in his car. They were often seen together in public in Carlisle, and appellant would put his arm around her and introduce her to his friends. She concluded from his conduct that he was possibly interested in a romantic or sexual relationship,[6]

---

6. Her testimony was as follows:

A. When I left, he would come out and he would say, well, good night. And he would give me a kiss good night.

Q. Did you get the feeling at that time that there was something more that interested him than the discussions about partying?

A. I can't say that I know what was going through his mind. I can only draw some sort of a conclusion.

although he always treated her respectfully. However, she never offered and he never requested sexual relations.

The telephone calls and meetings continued, with Hammond constantly requesting drugs and appellant just as consistently failing to provide them. She would insinuate that he couldn't get any drugs, while he again assured her no payment would be necessary for any drugs he produced. Appellant kept up his entreaties, asking her to meet him after midnight and once to stay overnight, all of which she declined. On one occasion, she mentioned she felt ill and appellant offered to get her a motel room. Around this time, he also started suggesting to Hammond that she move to Carlisle.

Eventually, she arranged a meeting with him on the evening of March 23 at the Hamilton Lounge. She testified on direct examination that:

A. After he made these statements about being able to take care of me as far as drugs were concerned, seeing how this was something I had heard from him on several occasions before I just really didn't take it that seriously. And I just said to him, well, you know, you are all talk. I have heard this before. And that's all I ever hear is just talk.

And he said, well, I am going to show you that I am on the level here. He said I am going to get a dime bag of grass this evening. And while I was talking with him another individual entered the bar....

Q. The codefendant in this case?

A. That's correct.

Q. Go ahead, what happened next?

A. And shortly afterwards [appellant] called over to Mr. Coleman. And he took a $10.00 bill out of his pocket

Q. What conclusion did you draw?

A. Perhaps that he had—I don't know, perhaps I guess that he would have ideas of attempting to take me to bed, I don't know.

(N.T. Trial at 73)

and put it on the bar. And he said to Mr. Coleman, "I want you to get me a dime bag of grass."
(N.T. Trial at 12).

Appellant thereafter obtained 4.5 grams of marijuana from his friend, a Mr. Coleman, and gave it to Hammond. Appellant and Hammond then left the bar and went to his car where he rolled some marijuana cigarettes with papers supplied by Hammond. She offered to pay for the marijuana, but he refused to accept any money.

The final meeting during the investigation was on April 11, 1981 at the Hamilton Lounge. This date had been pre-arranged by Hammond by phone. Appellant asked her how the marijuana was and whether she had any left. She replied that since it was such a little amount, there was no more left. He then talked of obtaining more drugs for her, but never produced any. The meeting ended after the two of them drove around Carlisle looking at apartments as appellant continued to talk about her moving there. Eventually, appellant offered to pay one-half of her rent if she moved to Carlisle.

We now turn our attention to the issue of entrapment.

The present test for entrapment is set forth in section 313 of the Pennsylvania Crimes Code, 18 Pa.C.S. § 313.[7] That section states in pertinent part:

§ 313. Entrapment

(a) General rule.—A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

(1) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

7. Act of December 6, 1972, P.L. 1482, No. 334, § 1, effective June 6, 1973, 18 Pa.C.S. § 313.

(2) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

**(b) Burden of proof.**—Except as provided in subsection (c) of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of the evidence that his conduct occurred in response to an entrapment.

■ The test for entrapment in Pennsylvania under section 313 is an objective one which "focus[es] on the conduct of the police and will not be concerned with the defendant's prior criminal activity or other indicia of a predisposition to commit crime." *Commonwealth v. Jones,* 242 Pa.Super. 303, 311, 363 A.2d 1281, 1285 (1976); *see also Commonwealth v. Taylor,* 299 Pa.Super. 113, 445 A.2d 174 (1982); *Commonwealth v. Danko,* 281 Pa.Super, 97, 421 A.2d 1165 (1980); *Commonwealth v. Stokes,* 264 Pa.Super. 515, 400 A.2d 204 (1979); *Commonwealth v. Manley,* 252 Pa.Super. 77, 380 A.2d 1290 (1977), *vacated on other grounds,* 491 Pa. 461, 421 A.2d 636 (1980). This statute represented a significant shift in Pennsylvania law, in that it rejected the then-existing use of a subjective test in entrapment cases, i.e., a test which focused on the defendant's predisposition to commit the crime.[8]

■ While the judicial focus in entrapment cases had changed, the case law has been consistent in Pennsylvania

8. *Commonwealth v. Jones,* 242 Pa.Super. 303, 310 n. 5, 363 A.2d 1281, 1285 n. 5 (1976). *See also Commonwealth v. Ferguson,* 289 Pa.Super. 163, 174 n. 3, 432 A.2d 1103, 1108 n. 3 (1981) (Hoffman, J., dissenting). The existence of these two tests demonstrates a sharp controversy over the proper theoretical basis and application of the defense of entrapment, a disagreement perhaps most clearly seen in a series of United States Supreme Court decisions dealing with the defense. *See United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). This court, however, has clearly stated that the "present codification of entrapment [§ 313] finds its origin in Mr. Justice Frankfurter's concurring opinion in *Sherman....*" *Commonwealth v. Jones, supra,* 242 Pa.Super. at 311, 363 A.2d at 1285. The objective test set forth there "shifts attention from the record and predisposition of the particular defendants to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit a crime." *Sherman v. United States, supra,* 356 U.S. at 383–84, 78 S.Ct. at 826–27.

in holding that the determination of whether police conduct constitutes entrapment is for the jury, unless the evidence of police conduct clearly establishes entrapment as a matter of law. *Commonwealth v. Berrigan*, 234 Pa.Super. 370, 373–374, 343 A.2d 355, 357 (1975) (divided court) (applying subjective test); *Commonwealth v. Manley, supra*, 252 Pa.Super. at 87, 380 A.2d at 1294 (applying objective test). Thus, after the defense of entrapment has been properly raised, the trial court should determine the question as a matter of law wherever there is no dispute as to the operative facts relating to the defense.

A careful review of the record in this case reveals no significant discrepancy in testimony of the Commonwealth's sole witness (Trooper Hammond) and of appellant regarding the course of conduct between the two over a ten month period. Appellant was a middle-aged black male and the trooper was a young, blonde, attractive female. A series of meetings and telephone calls occurred over a ten-month period, all at the initiative of Trooper Hammond. Drugs were constantly discussed. Although it is not always clear who brought the subject up on each occasion; what is clear is that beginning on September 29, 1980, Hammond began requesting drugs from the appellant. By early 1981, and perhaps earlier, Hammond began to chide and criticize appellant for his consistent failure to obtain or provide drugs. Beginning in late 1980 or early 1981, the two began kissing after each meeting. Hammond also permitted appellant to put his arm around her, walked around in public with him, and socialized with his friends.

This testimony regarding Hammond's course of dealings is uncontradicted.[9] In fact, testimony of Hammond and

9. In rejecting appellant's motion for a new trial and motion in arrest of judgment, the trial court found "some conflicting testimony as to the extent of the parties' emotional involvement or assumed emotional involvement with each other and as to the effect this may have had on defendant's actions." Lower court opinion at 7–8. Without addressing appellant's second contention in this appeal, we note that this "conflicting testimony" relates not to the trooper's conduct and appellant's response to it, but rather to the supposed *state of mind* of this particular appellant. By considering the testimony, the lower court focused subjectively on appellant's mental state, and not on the conduct of the

appellant corroborate each other, as both agreed as to dates and locations of meetings, the clothes worn by Hammond on different occasions, the approximate time the kissing began, her repeated requests for drugs and criticism of his failure to provide them, etc. The critical question, of course, is whether or not this uncontradicted testimonial evidence of police conduct establishes entrapment as a matter of law.

As Mr. Justice Frankfurter noted, this "crucial question [is] not easy of answer." *Sherman v. United States, supra,* 356 U.S. at 382, 78 S.Ct. at 825. Answering that question is made all the more difficult by the fact that we have found no cases where either this court, or our supreme court, has found entrapment as a matter of law under the objective test of section 313.[10] Indeed the supreme court has never addressed the section 313 entrapment defense, except to intimate in passing that the statute changed Pennsylvania law in this area. *Commonwealth v. Herron,* 475 Pa. 461, 468 n. 2, 380 A.2d 1228, 1231 n. 2 (1977).

Some guidance can be found in the *Sherman* concurring opinion.[11] In that opinion, the objective test was said to be necessary in order to advance the ultimate goal which the doctrine of entrapment seeks to establish, i.e., "[p]ublic confidence in the fair and honorable administration of justice." 356 U.S. at 380, 78 S.Ct. at 825. The test, therefore, is aimed at condemning certain impermissible police conduct which, regardless of who may be induced by it to commit a crime, "falls below standards, to which common feelings respond, for the proper use of government power." *Id.* at 382, 78 S.Ct. at 825. Although entrapment necessarily

police as contemplated by the statute. Also, what appellant "thought" and what Hammond supposed he "thought" are not "conflicting" but only different.

**10.** Further muddying the waters in this area of the law, there appears to be some inconsistency in the way this court has applied the objective test of § 313, an inconsistency which has not gone unnoticed. *Commonwealth v. Taylor,* 299 Pa.Super. 113, 120–21 n. 2, 445 A.2d 174, 177–78 n. 2 (1982); *see also* Comment, *Entrapment: The Myth of the Model Penal Code in Pennsylvania,* 86 DICK.L. REV. 115 (1981); Ranney, *The Entrapment Defense—What Hath Model Penal Code Wrought?,* 16 DUQ.L.REV. 157, 158–61 (1977–1978); Park, *The Entrapment Controversy,* 60 MINN.L.REV. 163, 168 n. 16 (1976).

**11.** See note 8, *supra.*

must be decided on a case-by-case basis, impermissible activity may include "[a]ppeals to sympathy, friendship, the possibility of exorbitant gain and so forth." *Id.* at 383, 78 S.Ct. at 826.

Courts in other states which have also adopted the objective test provide additional insight into its application.[12] For example, in *State v. Mullen,* Iowa, 216 N.W.2d 375, 382–383 (1974), the Supreme Court of Iowa stated:

> In adopting an objective test we do not intimate the transactional negotiations and conduct of the government official (or his agent) and the defendant shall be ignored. What was said, and the defendant's response to the inducements, should all be considered in judging what the effect of the government conduct would be on normally law-abiding persons. Depending on an evaluation of the facts in each case, prohibited governmental activity might include extreme pleas of desperate illness, appeals based primarily on sympathy, pity or close personal friendship, and offers of inordinate sums of money. (Citations omitted).

Finally, the opinions of this court addressing the entrapment defense provide us with direction in deciding, even if not providing examples of, the existence of entrapment. In *Commonwealth v. Manley, supra,* the appellant acted as middle-man in four drug sales to an undercover officer which occurred over a period of a month and a half. The transactions had been set up by an informant who was a friend of the appellant. Appellant argued entrapment, contending that he was induced by the informant's repeated requests for drugs. In finding no entrapment existed as a matter of law, the *Manley* court noted that there was no evidence indicating the undercover agent was aware of the number or type of requests made by the informant, nor that

---

**12.** In addition to Pennsylvania, the objective test has been adopted by statute in Hawaii, New Hampshire and North Dakota. It has been judicially adopted in Michigan, Iowa, California and Alaska. Comment, *Causation and Intention in the Entrapment Defense,* 28 U.C.L.A. L.REV. 859, 862 n. 16 (1981). *See also* Park, *supra,* at 168.

the agent had "encouraged [the informant's] repeated requests in order to wear down appellant's resolve." *Commonwealth v. Manley, supra,* 252 Pa.Super. at 87, 380 A.2d at 1294.

In *Commonwealth v. Stokes, supra,* we found no entrapment existed in a case where appellant sold heroin to an undercover agent. However, there the facts showed the officer had merely provided appellant with a market for the drugs by letting the appellant know he was interested in buying some heroin, and had never importuned appellant to make a sale.

Hence, *Stokes* reaffirmed the position, which was held in Pennsylvania prior to the enactment of section 313, that mere opportunity does not constitute entrapment. *See also Commonwealth v. Tami,* 309 Pa.Super. 341, 455 A.2d 641 (1982). We have also stated that "artifice and stratagem are legitimate tactics that may be employed by law enforcement officials to detect and combat crime." *Commonwealth v. Lee,* 262 Pa.Super. 218, 396 A.2d 724 (1978).

■ In light of all this, and under the facts of this case, we are convinced that the methods employed by the Commonwealth constitute entrapment as a matter of law. The Commonwealth, acting through Trooper Hammond, pursued a long term, persistent course of persuasion and inducement aimed at luring appellant into delivering marijuana to Hammond. The use of a young, blonde female to coax a middle age male, after months of kissing and socializing, into committing a minor crime is not police conduct which presents the "mere opportunity" to commit a crime. As this case clearly shows, opportunity and inducement are two separate consequences of police activity. The latter occurred here.

Furthermore, this is not a case like *Manley* where the police were unaware of the importuning of a government agent (often an informant) involved in the investigation.

Not only was Trooper Hammond obviously aware of her actions and of appellant's interaction with her, she also admitted to suspecting the effect her conduct was having on appellant, i.e., romantic or sexual desires.[13]

We are satisfied that appellant has successfully invoked the defense of entrapment by proving "by a preponderance of evidence that his conduct occurred in response to an entrapment." 18 Pa.C.S. § 313(b). This burden was clearly met by the unconflicting testimony of both appellant and Trooper Hammond. *See, Commonwealth v. Berrigan, supra,* 234 Pa.Super. at 381, 343 A.2d at 361 (Hoffman, J., opinion in support of reversal) (testimony of government informant sufficient to meet defendant's burden).

The law enforcement authorities clearly strayed beyond the limits of acceptable practice in this case. We cannot sanction methods of inducement such as this, which lure otherwise law-abiding citizens into crime. Here the appellant has conceded his guilt, as he must when the entrapment defense is invoked under the objective test. *Commonwealth v. Jones, supra,* 242 Pa.Super. at 314, 363 A.2d at 1286. However, it is the Commonwealth that is guilty of the greater evil of playing an ignoble part. *Sherman v. United States, supra,* 356 U.S. at 380, 78 S.Ct. at 824 (Frankfurter, J., concurring).

Judgment of sentence is reversed.

WICKERSHAM, J., files dissenting opinion.

WICKERSHAM, Judge, dissenting:

I would affirm on the opinion of the Cumberland County Court *en banc* by Honorable Harold E. Sheely, P.J.

13. See note 6, *supra.*