R. A. Smith, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania State Horse Racing Commission, Respondent.

Argued September 12, 1985, before Judges CRAIG and MACPHAIL, and Senior Judge BLATT, sitting as a panel of three.

*Bruce E. Cooper,* for petitioner.

*John Wm. Schreck,* with him, *John B. Hannum, Jr.,* for respondent.

OPINION BY JUDGE CRAIG, October 29, 1985:

Robert A. Smith questions a November 8, 1984 order of the Pennsylvania State Horse Racing Commission that revoked his jockey license, on the basis of 58 Pa. Code §167.58[1] Based on the results of an undercover investigation, and after a hearing, the commission concluded that Smith conspired to fix horse races. In this appeal Smith contends that the state, in its investigation, used procedures that, as a matter of law, entrapped Smith. He further contends that the commission, at its hearing, failed to allow him to use entrapment as a defense. We reverse.

Our limited scope of review in these cases requires us to affirm an adjudication of the commission unless that adjudication did not conform with law or procedure or if necessary findings of fact are not supported by substantial evidence. *McKenna v. Pennsylvania State Horse Racing Commission,* 83 Pa. Commonwealth Ct. 116, 476 A.2d 505 (1984).

---

[1] 58 Pa. Code §163.58 states:
The experience, character, or general fitness of any applicant or licensee is such that the participation of such person in thoroughbred horse racing or related activities would be inconsistent with the public interest, convenience, or necessity, or with the best interest of racing generally.

The first issue that we must consider is whether an entrapment defense may be available in an administrative disciplinary hearing at which a licensee's ability to practice a profession or business is at stake. The commission contends that, because it did not accuse Smith of committing any crime, an entrapment defense should not be available to Smith.[2] The commission further held, in its adjudication, that the license revocation resulted only from questions regarding Smith's experience, character, and general fitness.

Because this is a question of first impression, each party directs our attention to cases in other jurisdictions that either allow or disallow use of an entrapment defense in administrative disciplinary proceedings. We are persuaded that the correct view is to allow the use of an entrapment defense.

The case the commission cites, *Ballew v. Ainsworth*, 670 S.W. 2d 94 (Mo. App. 1984), (denying the use of an entrapment defense in an insurance license action), reflects an overriding interest in protecting the public, and does so "without regard to the niceties associated with the interpretation of criminal statutes." 670 S.W. 2d at 100. The case Smith cites, *Patty v. Board of Medical Examiners*, 9 Cal. 3d 356, 508 P.2d 1121 (1973), (allowing an entrapment defense in a medical

---

[2] In *Sorrells v. U. S.*, 287 U.S. 435 (1932), Mr. Justice ROBERTS' concurring opinion, joined by Mr. Justices BRANDEIS and STONE, states that the policy underlying entrapment

frankly recognizes the true foundation of the doctrine in the public policy which protects the parity of government and its processes. Always the courts refuse their aid in civil cases to the perpetration and consummation of an illegal scheme. . . . Neither courts of equity nor those administering legal remedies tolerate the use of their processes to consummate a wrong. The doctrine of entrapment in criminal law is the analogue of the same rule applied in civil proceedings. (Footnote omitted.)

license action), is predicated on the twin ideas that we may have more to fear from an overzealous state effort to protect the public from a perceived harm than we do from a risk of the harm itself and that "preservation of the dignity of the legal process and of public confidence in it are as applicable to the conduct of administrative proceedings as to criminal trial. . . ." *Id.* at 59, 508 P.2d at 1122.

In *Patty,* the court reversed an order of the California Board of Medical Examiners which, based on a finding that a doctor had sold illegal narcotics to board investigators, imposed disciplinary sanctions on the physician. The doctor claimed that he had been entrapped and the court agreed, concluding that the "recognition of the defense of entrapment is crucial to the fair administration of justice. If this is true for proceedings before trial courts, it is no less true for proceedings before administrative agencies." 9 Cal. 3d at 364, 508 P.2d at 1126.

We agree with the *Patty* court that public concern for fair administration of justice attaches equally to administrative and judicial proceedings. A potential danger of excess and abuse is involved in permitting an agency to test all licensees to determine who possesses a possible ethical weakness.

We must next decide whether the state's investigation constituted entrapment under 18 Pa. C. S. §313:[3]

(a) *General Rule.* A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

---

[3] Section 313 of the Crimes Code, 18 Pa. C. S. §313.

(1) Making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(2) Employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

(b) *Burden of Proof.* Except as provided in subsection (c) of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of evidence that his conduct occurred in response to an entrapment.

(c) *Exception.* The defense afforded by this section is unavailable when causing or threatening bodily injury is an element of the offense charged and the prosecution is based on conduct causing or threatening injury to a person other than the person perpetrating the entrapment.

This statute provides an objective test for entrapment which focuses on the conduct of the law enforcement officials and is not concerned with a defendant's previous criminal activity or predisposition to commit a crime. *Commonwealth v. Thompson,* 335 Pa. Superior Ct. 332, 484 A.2d 159 (1984).

The commission's own findings of fact best set forth the events leading up to Smith's involvement:

4. Robert A. Smith entered into a discussion with another jockey, in early February of 1984; and the other jockey asked him if he wished to get into 'some business with' the other jockey. At that time, the other jockey gave Mr. Smith $500.00 (NT 92).

5. On February 24, 1984, Mr. Smith and the other jockey went to a Penn Supreme store on

a street near Penn National Race Course for the purposes of making a telephone call.

6. The telephone call was about the 'business' between the Appellant and the other jockey.

7. At the time that the two parties were to make a telephone call, agents of the Attorney General's Office, posing as various species of pimps, and Mafia members, drove into the parking lot.

8. The other jockey told the Appellant that these were 'bad people' and that the Appellant could 'help him out' if the Appellant came into the car and went along with whatever the 'bad people' were proposing.

9. The Appellant, it is apparent from all of the evidence, went into the car.

10. The Appellant took $500.00 for the purpose of being included in a group of riders who would receive instructions on certain races from the jockey who had brought the Appellant to this meeting.

11. The Appellant left the car.

12. The jockey that had brought the Appellant to the meeting stayed in the car and discussed various monetary arrangements under which he was to try and bring other jockeys into this group.

13. The jockey that had brought the Appellant to this meeting received $100.00 for bringing the Appellant to the meeting. Additionally, he received $100.00 for each and every other jockey that he could bring to the same type of meeting.

14. The other jockey left the car and joined the Appellant.

15. The Appellant and the other jockey went to a bar, and the Appellant attempted to give the other jockey the $500.00 that he had taken from the agents. The other jockey convinced the Appellant to keep the money, which the Appellant did.

These findings establish entrapment as a matter of law. Enforcement officials may investigate, but they cannot cause the commission of offenses. This investigative procedure employed "methods of persuasion or inducement " which created a "substantial risk that such an offense" would be "committed by persons other than those who are ready to commit it." 18 Pa. C. S. §313(a)(2). Here, as Finding of Fact No. 8 indicates, intimidation was involved in inducing Smith to enter into a discussion of unlawful plans.

State agent McCormack testified that he paid Vergara $500 through an intermediary and discussed recruiting jockeys with Vergara. McCormack stated that:

Question: And what impression did you leave Vergara under, why was he being paid one hundred dollars ($100) to bring people to meet you?

Answer: The impression that we left with him was that our problem was that under the State's statutes, we weren't allowed to go and run a fixed race because of the problems they had had in other states. So we had to be able to have some means to keep these people on the hook, *to get them involved in a conspiracy,* but not let the conspiracy go far enough so the public would be defrauded in a fixed race. The way we did that is, we told Vergara that we wanted to get 'X' number of jockeys on our payroll

and that way when we were ready to go with our race they would then be working for us.

Question: In other words, you were selling Vergara on the idea that you were setting up a scheme to get jockeys on the payroll and that for every one he'd bring in he'd get a hundred bucks ($100), right?

Answer: Basically, yes.

. . . .

Question: And is it your testimony, under oath, that insofar as you know, from that two and a half (2 1/2) month period before, when Vergara got the five hundred ($500), until February 24, he was not in the know that the police . . . that an investigation, a criminal investigation was going on?

Answer: He didn't find out until March 12, 1984.

Question: Which was almost a month after.

(Emphasis added.)

This conduct appears to be, insofar as it involves Smith, a situation in which the Commonwealth constructed a course of action to lure or, as here, even coerce jockeys into a conspiracy of the Commonwealth's design. Further, we note from the commission's adjudication that "[t]he jockey [Vergara] said to the Appellant that 'he helped him out of a tight spot' and that *he might not even be called concerning this race.*" (Emphasis added.)

The commission urges us to consider "serious policy arguments" in deciding whether or not the activity constituted entrapment, attempting to justify the means in light of the ultimate goal. The commission cites *Daly v. State Horse Racing Commission,* 38 Pa. Commonwealth Ct. 77, 391 A.2d 1134 (1978) to emphasize the legislative desire to maintain public

confidence in racing, and *Helad Farms v. Pennsylvania State Harness Racing Commission,* 79 Pa. Commonwealth Ct. 314, 470 A.2d 181 (1984), as stating that the goal of the Race Horse Industry Reform Act[4] is to make the horse racing industry's image beyond reproach. In its brief, the commission contends that the purpose of the act is to protect the public, and "to accomplish that purpose, the Act's language should be given its ordinary meaning without regard to niceties associated with the interpretation of criminal statutes." However, the commission does not address the parallel point of the desire of the Commonwealth to foster public confidence in the fair conduct of state enforcement methods. Neither does the commission address the public policy argument that rejection of an entrapment defense would in effect authorize agents to entrap and encourage a shift in resources from the detection of existing illegal activities to the promotion of new illegal acts.

We cannot sanction the methods of inducement employed here. Although we agree that there is a serious need to protect the public from unscrupulous race track activities, we must also be concerned about other evils. *Commonwealth v. Thompson,* 335 Pa. Superior Ct. 332, 484 A.2d 159 (1984) (citing *Sherman v. United States,* 356 U.S. 369, 380 (1958) (FRANKFURTER, J., concurring)).

The commission attempts to distinguish this case from other entrapment cases because, it claims, Vergara was a fellow conspirator who did not know that he worked for the police. The point does not affect our analysis because the Commonwealth cannot hide behind a shield of an unknowing accomplice whom the Commonwealth agents manipulated.

---

[4] Race Horse Industry Reform Act, Act of December 17, 1981, P.L. 435, *as amended,* 4 P.S. §§325.101-325.402.

We note that Smith kept the money that he received in connection with this scheme. Did that fact furnish a basis for the suspension? We think not. The objective standard of our entrapment statute focuses on police conduct rather than on the entrapped individual's conduct, and the commission's Finding of Fact No. 15 stated:

The appellant and the other jockey [Vergara] went to a bar, and the Appellant attempted to give the other jockey the $500 that he had taken from the Agents. *The other jockey convinced the Appellant to keep the money,* which the appellant did. (Emphasis added.)[5]

Finally, although the commission cites 58 Pa. Code §163.6, which requires that persons who are "in possession of any knowledge or information regarding attempts or acts done in violation of any rule or regulation of the Commission or statute affecting racing shall promptly report such knowledge or information to the Stewards, the Commission, or its licensed security personnel . . .", the commission did not revoke Smith's license for that reason. The commission's September 5, 1984 letter, notifying Smith of the reasons for his license revocation and his right to appeal, cites 58 Pa. Code §163.58 as basis for revocation and does not mention §163.6. Accordingly, the commission cannot, at this juncture, raise that point.

Because we decide this case on the entrapment issue, we need not address Smith's second contention that the Attorney General and Commission failed to

---

[5] We also reiterate that Smith received, and kept, an additional $500 from Vegara in conjunction with the early February discussion in which Vegara asked him if he "wished to get into 'some business with' the other jockey." Finding of Fact No. 4. However, the commission made no finding with regard to the propriety of either the "business" or the payment at that juncture.

adhere to lawful oral communication intercept procedures.

Therefore, we reverse.[6]

### ORDER

Now, October 30, 1985, the order of the Pennsylvania State Horse Racing Commission dated November 8, 1984, No. 84-051, affirming the revocation of R. A. Smith's license, is reversed and R. A. Smith's license is restored.

---

[6] In oral argument the commission directed this court's attention to a recent New Jersey jockey license case, *Delguidice v. New Jersey Racing Commission*, 100 N.J. 79, 494 A.2d 1007 (1985). Because that court took pains to point out that the issue there, unlike here, was not whether the appellant "was entitled to urge an entrapment defense before the Racing Commission, but rather whether evidence that had been found to have been secured in a fundamentally unfair way could be used before that body." 100 N.J. at , 494 A.2d at 1009, the issue before that court was "couched in terms of a rule of exclusion of evidence," Moreover, there were numerous factual distinctions between *Delguidice* and this case.

---

DISSENTING OPINION BY JUDGE MACPHAIL:

I respectfully dissent.

My learned colleagues here determine that entrapment is available as a defense in an administrative proceeding and support their conclusion with very cogent rationale. I, however, do not believe we should judicially accept this defense in such a proceeding and especially not in a proceeding before the Pennsylvania State Horse Racing Commission (Commission) which has such unique objectives.[1]

Entrapment is a statutory defense to *criminal* actions in Pennsylvania. It is my position that if the defense is to be extended to administrative proceedings, it first must be ordained by the legislature. I

---

[1] See slip opinion pages 8 and 9.

further believe that the case law relied upon by the Commission[2] is more persuasive than that relied upon the Petitioner.[3] Finally, I believe that entrapment is such a complicated and variegated defense that adjudicatory personnel of administrative boards, commissions and agencies, who are largely untrained in the law, are ill-equipped to determine whether or not the defense should prevail in an administrative proceeding.

To illustrate my last point in the preceding paragraph, I respectfully disagree with my colleagues who, of course, are well-trained in the law, that the factual matrix of the instant case gives rise to the defense of entrapment. Consider what transpired: Vergara, who was the enticing jockey, did not know he was dealing with enforcement officers when he induced the Petitioner to accept the $500. One of the first requirements of entrapment is that the acting party be either a public law enforcement officer or a person acting in cooperation with such an official. *See* Section 313 of Crimes Code, *as amended*, 18 Pa. C. S. §313. Cases from the Third Circuit of the United States Court of Appeals have consistently held that the entrapment defense is not available if the person alleging entrapment was brought into the criminal enterprise by someone not a government agent. *See United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978) and cases cited therein. Vergara was neither a law enforcement officer nor a person acting in cooperation with such officers. I do not believe that it makes any difference that Petitioner *attempted* to return the $500. The "bottom line" is that he kept it and he kept it when he was outside the presence of the law enforcement

---

[2] *Ballew v. Ainsworth*,     Mo. App.    , 670 S.W. 2d 94 (1984).

[3] *Patty v. Board of Medical Examiners*, 9 Cal. 3d 356, 508 P.2d 1121, 107 Cal. Rptr. 473 (1973).

officers. It is hard for me to conceive that *any* intimidation occurred at that time.

When law enforcement officers overreach their authority to the point where their conduct is outrageous, fundamental fairness, of course, requires that a defendant cannot be convicted of a crime. *Twigg.* Here, of course, there is no criminal action and, in my opinion, the conduct of the enforcement officials falls short of being outrageous in any event.

Finally, I do not believe that Petitioner has proved that the enforcement officers or the Commission failed to adhere to lawful oral communication intercept procedures.

I, therefore, would affirm the Commission.