535 A.2d 596

**R.A. SMITH, Appellee,**

v.

**PENNSYLVANIA STATE HORSE RACING COMMISSION, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 9, 1987.

Decided Jan. 6, 1988.

---

John William Schreck, John B. Hannum, Jr., West Chester, Stephen R. Pelcher, York, Christopher A. Lewis, Philadelphia, for appellant.

Bruce Cooper, Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Review was granted in this matter to consider the questions (1) whether the defense of entrapment is available in administrative, to wit license revocation proceedings, and, if so, (2) whether the defense is available to the appellee in this case. Appellee, R.A. Smith, is a jockey whose license was suspended by appellant, the State Horse Racing Commission, on charges that he conspired to fix the outcome of a horse race.

The salient facts, as set forth in the Commission's adjudication, are as follows. Early in 1984, Smith met another jockey, one Vergara, who was unknowingly acting as an agent of investigators from the Attorney General's office. Vergara was participating in a scheme to entice other jockeys to agree to fix a race at some time in the future. In return for his agreement, each jockey received $500. Vergara received $100 per jockey for every jockey he enlisted.

Vergara asked Smith whether he would be interested in "doing business," and, on February 24, 1984, the two men went to a store in the vicinity of the Penn National Race Course to make a phone call in furtherance of this "business." Upon arriving at the store, Vergara spotted the agents from the Attorney General's office. Vergara advised Smith that the agents were "bad people" and that Smith could "help him out" if Smith joined Vergara in the agents' car and went along with whatever these bad people were proposing. Smith did so. He entered the car, talked about the plans to fix races, and accepted $500 in cash.

Once out of the car, Smith and Vergara went to a bar where Smith attempted to give Vergara the $500. Vergara convinced Smith to keep the money saying that Smith had "helped him out of a tight spot" and that Smith might not ever be called concerning a race.

Smith's license was revoked, on grounds his "experience, character or general fitness ... is such that [his] participation ... in horse racing or related activities would be inconsistent with the public interest, convenience or necessity or with the best interests of racing." 4 P.S. § 325.213, 58 PA. Code § 163.58. On appeal to the Commission from the initial revocation decision, Smith raised the defense of entrapment. The Commission rejected the defense, on the grounds that entrapment is only available as a defense to a criminal prosecution. Commonwealth Court reversed, 92 Pa.Cmwlth. 472, 501 A.2d 303.

In 1972, the General Assembly defined entrapment; the definition is contained in the Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334, eff. June 6, 1973, 18 Pa.C.S.A. §§ 101 et seq. That enactment provides, in relevant part, as follows:

§ 313. Entrapment

(a) General rule.—A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by ...

. . . . .

(2) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

(b) Burden of proof.— ... [A] person prosecuted for an offense shall be acquitted if he proves by a preponderance of evidence that his conduct occurred in response to an entrapment.

18 Pa.C.S.A. § 313. With certain exceptions not here pertinent, entrapment, as defined in § 313, is applicable in all proceedings charging offenses against the Commonwealth, whether or not those proceedings arise out of Title 18.

Section 107(a) of the Crimes Code provides: "The provisions of Part I of this title [18] (relating to preliminary provisions) are applicable to offenses defined by this title or by any other statute." Although the term "offense" is not specifically defined in the Crimes Code, the term generally connotes a crime or misdemeanor—a breach of the criminal laws. *Commonwealth v. Brown*, 264 Pa. 85, 90, 107 A. 676 (1919) (overruled sub silentio in *Commonwealth v. Harris*, 351 Pa. 325, 336 n. 5, 41 A.2d 688, 694 n. 5 (1945) on unrelated issue of whether response to a question can constitute res gestae); BLACK'S LAW DICTIONARY 1232 (4th Ed.1951). Thus, the defense of entrapment as codified is available only in the context of a criminal prosecution. This does not end our inquiry, however, for the question of what remains of the common law defense, and whether that defense ought to be available in administrative actions to revoke licenses yet remains.

The defense of entrapment is a relatively recent development in the law.* Its recognition in Pennsylvania case law predates § 313, which is apparently the first codification of the defense in this Commonwealth, by many years. See, *Commonwealth v. Wasson*, 42 Pa.Super. 38, 57, (1910). The defense was spawned when "upon grounds of public policy the courts ... refused to sustain convictions because of the abhorrent methods adopted to lure the accused into crime." *Id.* at 57. Thus, prior to the enactment of § 313, the defense was available "when a law enforcement officer, by employing methods of persuasion or inducement which create[d] a substantial risk that persons not otherwise ready to commit the criminal act w[ould] do so, actually induce[d] such a person to commit the act. The rule require[d], before the defence bec[a]me available, (1) a defend-

---

* Commentators fix its earliest acceptance as a defense during the late nineteenth century, Ranney, *The Entrapment Defense—What Hath the Model Penal Code Wrought?*, 16 Duquesne L.Rev. 157 (1977–78).

ant not disposed to commit the crime, and also (2) police conduct likely to entrap the innocently disposed." *Commonwealth v. Conway*, 196 Pa.Super. 97, 103–104, 173 A.2d 776 (1961).

Although the entrapment defense was developed in the context of prosecutions for violations of the criminal law, it has been raised in administrative proceedings as well. See, e.g. *4–6 Club v. Pa. L.C.B.*, 442 Pa. 154, 275 A.2d 40 (1971), *In re Hoffco Corp.*, 198 Pa.Super. 1, 180 A.2d 270 (1962); *Appeal of Italian Citizens Nat. Ass'n. of America*, 178 Pa.Super. 213, 115 A.2d 881 (1955); see also Annotation, *Entrapment as a Defense in Proceedings to Revoke or Suspend License to Practice Law or Medicine*, 61 A.L.R.3d 357 (1975. In each of the cases cited, the defense was rejected on grounds the conduct of law enforcement personnel did not sink to the level of entrapment. In none of these cases, however, was the question of its applicability per se in administrative proceedings discussed. Rather, for the sake of the discussion, availability of the defense was assumed.

In the criminal law, the defense of entrapment rests on the policy that the Commonwealth cannot tolerate having its own officials, who are charged with the duty of enforcing the law, instigating crime, at times by means which are themselves criminal, by implanting in minds not predisposed to commit crime criminal ideas, and thus effecting crimes which would otherwise never have been committed. This policy is laudable. Because instances may arise in the administrative setting, where, in order to prompt otherwise innocent licensees to violate laws and thereby lose their licenses, officials employ investigative techniques which are so egregious as to shock men of good conscience, we will not announce a rule which would preclude a tribunal so disposed from frustrating the intent of the overreaching officials by preserving the status of the licensee. Query, however, whether a licensee should avoid a revocation where the basis for that revocation is not a specific violation of an applicable statute or regulation but general fitness to

hold the license as reflected in his or her behavior as is the case here.

▆▆ Smith's license was revoked, not because he violated any specific legislative or regulatory provision, but because his "character or general fitness ... is such that [his] participation ... in horse racing ... would be inconsistent with the public interest, ... or with the best interests of racing." 4 P.S. § 325.213(f)(2); 58 PA. Code § 163.58. This fact is made out not because he succumbed to his friend's entreaties to appear to go along with the "fixing" of races for the sake of the friend, but because in so doing he compromised both his own integrity and that of the industry. He voluntarily pursued a course of conduct which was calculated to make at least some members of the public believe that the outcome of races is the product of influences beyond the talent, ability and good fortune of the participants. This activity erodes the public confidence in the industry, and thus frustrates the legislative purpose requiring licensing.

▆▆ In sum, while we recognize that instances may arise where a defense like "entrapment" may be properly afforded in the administrative context, we do not view the matter before us as such a case. Thus, the order of Commonwealth Court is reversed.

In addition to the question addressed herein, Smith challenged the oral communication intercept procedures employed by the office of the Attorney General and the Commission. This issue was not addressed by the court below. Thus, the record is remanded to the Commonwealth Court for consideration of this issue.

Reversed and remanded.

LARSEN, J., concurs in the result.

ZAPPALA, J., files a dissenting opinion.

ZAPPALA, Justice, dissenting.

I dissent. The conclusion reached by the majority today is a mere aberration. What it gives with the left hand, it takes away with the right. While concluding that the common law defense of entrapment is available in administrative proceedings, the majority then permits the conduct in question to be used against the entrapped party to blacken his character and revoke his license. In the area of administrative licensing proceedings, the defense of entrapment would not only fail to serve any useful purpose in the distorted manner it is applied to the instant facts, but further would frustrate the intended purpose behind both the statutory and common law rationales underlying the defense. Following the logic of the majority, in licensing procedures, where character or general fitness to hold the license is always a factor in disciplinary proceedings, the availability of the defense of entrapment as permitted by the majority, is totally illusory since the licensee is now faced with the "Hobson's choice" of either complete denial (and therefore foregoing the defense) or interposing the entrapment defense which, as in this situation, concedes that he has committed the crime even though entrapped. Implicit in this concession is the further admission that by virtue of this event, the licensee lacks the requisite character to hold the license he is attempting to preserve.

This holding is shallow at best. The majority points out, two elements which are necessary before the entrapment defense can be interposed. They are that (1) the defendant is *not disposed* to commit the crime and (2) that police conduct likely to entrap the innocently disposed is present. Majority Opinion at page 5 citing *Commonwealth v. Conway*, 196 Pa.Super. 97, 173 A.2d 776 (1961). If the licensee proves the two elements necessary to sustain the defense, it is not for us to then penalize him based upon the act conceded when it was shown that he was not predisposed to commit that act. Any finding of bad character of one who was not predisposed to commit the act is necessarily tainted. In addition, to allow this result would frustrate the

purpose for allowing such a defense, namely, to restrain law enforcement officials from instigating crime. I find this totally illogical and unwarranted. I would hold that in the administrative licensing area, proof of the defense of entrapment would be a complete bar to both the offense and the revocation of a license based solely on the character or fitness of the licensee as reflected by that specific factual situation. To hold otherwise, as the majority does today, is not only an exercise in futility, but also opens the policing of licensees to the abuses of officials which the defense of entrapment was intended to protect against. If the defense is to be permitted, it must be embraced with all its policy and implications. I therefore dissent.