540 A.2d 620

Robert J. Kulick, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania State Harness Racing Commission and Pocono Downs, Inc., Respondents.

Argued December 17, 1987, before Judges COLINS and PALLADINO, and Senior Judge KALISH, sitting as a panel of three.

*Daniel Radich,* with him, *Richard G. Phillips,* for petitioner.

*John B. Hannum, Jr.,* for respondent, Pennsylvania State Harness Racing Commission.

*Jerry B. Chariton,* with him, *Steven M. Greenwald, Shaffer & Chariton,* for respondent, Pocono Downs, Inc.

OPINION BY JUDGE COLINS, April 22, 1988:

Robert Kulick, licensed owner and trainer of standardbred racing horses (petitioner) appeals an Order of the Pennsylvania State Harness Racing Commission (Commission) affirming his exclusion by Pocono Downs, Inc. from its premises at Pocono Downs Race

Track pursuant to Section 215(c) of the Race Horse Industry Reform Act (Act).[1]

Pocono Downs' action in ejecting petitioner followed his alleged involvement in certain betting and racing irregularities pertaining to races held on August 29 and 30, 1985. The first incident, on August 29, involved the so-called Twin Triple, a race in which the bettor must pick the exact order of finish of the win, place and show horses in two consecutive races. Bettors who successfully select the precise order of those horses in the first race of the Triple may exchange each winning ticket for cash (one-half of the amount wagered in the pari-mutuel pool divided by the number of winning tickets) and an opportunity to bet in the second race, again selecting the win, place and show horses. In the event no bettor wins the Twin Triple, the remaining betting pool is carried over to the subsequent running of such race. In track parlance, this is referred to as the "carryover pool." On August 29, the Twin Triple involved the ninth and tenth races and was valued at approximately $56,000. Petitioner placed $7,000.00 in various bets on the first half of the Twin Triple. The Commission characterized his betting pattern in this race as highly irregular, due to the exclusion of the track favorite, a horse named Boardwalk Fella. Such exclusion, accord-

---

[1] Act of December 17, 1981, *as amended,* 4 P.S. §325.215(c), which, section pertinently provides that "[a] licensed corporation may refuse admission to and eject from the enclosure of the race track operated by the corporation, *any person licensed by the commissions* under section 213, employed at his occupation at the race track, *whose presence there is deemed detrimental to the best interests of horse racing, citing the reasons for that determination."* (Emphasis added, footnote omitted.)

We note that the preceding statutory subsection, 4 P.S. §325.215(b), affords a licensed corporation carte blanche in excluding a *track patron* for reasons other than race, creed, color, sex, national origin or religion.

ing to the Commission, raised the inference that petitioner had advance knowledge that the ninth race was "fixed". In a separate appeal involving disciplinary action against the driver of Boardwalk Fella, this Court affirmed the Commission's finding that Boardwalk Fella was restrained by his driver (referred to as "held" in racetrack vernacular). *See Frizalone v. Pennsylvania State Harness Racing Commission,* 112 Pa. Commonwealth Ct. 285, 535 A.2d 288 (1987), for a complete discussion of the bizarre incidents surrounding this race.

The second incident allegedly involving petitioner in the instant matter occurred on August 30, 1985, when petitioner's own horse, Late Bid, was favored to win the fifth race, a Triple. After Late Bid passed the "recall pole," he broke stride and failed to compete effectively in the race; his driver was ultimately cited for failing to contest the race. An associate of petitioner, one Ted Reap, won substantial sums of money by betting against petitioner's horse despite the horse's status as track favorite, again raising the inference that the outcome of the race was less than fortuitous. According to Pocono Downs, a "near riot" surrounded Mr. Reap's collection on his bet, a crowd reaction resulting from its awareness of the unusual discrepancy between the posted win odds and the low actual payout figure in that race. Shortly thereafter, Pocono Downs served petitioner with a Notice of Ejection as based on the above purported irregularites.

Upon petitioner's administrative appeal and after lengthy hearings before a designated Hearing Officer, the Commission issued a decision comprehensively analyzing the allegations proffered by Pocono Downs in support of its action. Most significantly, it found the above allegations to be speculative in nature and lacking "hard or sound" evidence of any betting impropriety or involvement on petitioner's part in the respective

failures of Boardwalk Fella or Late Bid. Nevertheless, the Commission upheld petitioner's ejection from the track, concluding that his purported activities reasonably raised the "appearance of impropriety." Petitioner's appeal followed.

At issue in the instant matter is the burden of proof imposed upon a track in support of a determination that the presence of a licensee[2] is detrimental to the best interests of racing. In support of a decision to eject from the track such a licensed person, Section 215(c) of the Act requires nothing more of the corporation than that it cite the reasons upon which its decision is based. Pocono Downs did so in the instant matter, setting forth the factual scenario we have previously discussed. The Commission, in its review, required not that such allegations of impropriety be *proven* but that the track's determination be *reasonable,* a standard which finds support in *Iwinski v. Pennsylvania State Horse Racing Commission,* 85 Pa. Commonwealth Ct. 176, 481 A.2d 370 (1984), wherein we stated that the "legal right of [a corporation] to exclude a licensed person from its track depends upon a reasoned determination that his presence there is 'detrimental to the best interests of horse racing.' " *Id.* at 179, 481 A.2d at 372 (emphasis deleted).

Petitioner now contends that Pocono Downs' decision was patently unreasonable as evidenced by the fact that the Commission ultimately found the allegations contained therein to be speculative in nature. In so doing, petitioner misperceives the focus of the Act.

---

[2] Section 213(a) of the Act, 4 P.S. §325.213(a), states that "[e]ach commission shall license trainers, jockeys, drivers, persons participating in thoroughbred and harness horse race meetings, horse owners and all other persons and vendors exercising their occupation or employed at thoroughbred and harness horse racing meetings. . . ."

Historically, wagering on horses has always been a subject surrounded by controversy. As a result of the unsavory connotations of horse betting, legalized pari-mutuel wagering and public racing came to Pennsylvania only recently, despite the Commonwealth having long been one of the nation's leading producers of prize harness racing, jumping and steeplechasing stock.

Under the stewardship of the Commission and its sister agency, the Pennsylvania State Horse Racing Commission (the regulatory body for thoroughbred racing), the breeding, raising, and racing of standardbred and thoroughbred horses has become one of the Commonwealth's major industries, creating over ten thousand jobs within the Commonwealth and generating millions of dollars of revenue at both the state and municipal levels.

For the racing industry to flourish, it was necessary for the Commissions to eliminate the pre-existing prejudice which surrounded certain of the public's perception of the sport. Dr. E. S. Montgomery, noted physician, author, and equine geneticist, summarized some of this skepticism, as it existed in the 19th century, in his classic text, *The Thoroughbred* (1971)[3]:

> My father was a Scotch Covenantor; he often told me that 'horses are high among God's most beautiful creations. Watching horses race for sport gives you an awareness of beauty in motion, but beware of the race track. It is a temple of sin; it is wasteful, sordid, and full of fools. Only half wits and hoodlums bet on the outcome of a horse race.'

I have not heeded his advice.

---

[3] Dr. Montgomery also noted that "[f]requently, intelligent people ask: 'Is racing a sport?'; 'Is racing a big business?'; 'Is racing a gambling game?' The answer: racing is all three."

It was because of attitudes such as those previously expressed that the legislature made a commitment to having Pennsylvania racing be the most pristine in the world, a task which the various racing Commissions have been successfully carrying out.

As we stated in *Helad Farms v. State Harness Racing Commission*, 79 Pa. Commonwealth Ct. 314, 320, 470 A.2d 181, 184 (1984), the Act's "overriding purpose [is] to foster an image of horse racing that would make the image of that 'industry' an irreproachable one, even in the eyes of the skeptical public." To that end, the Commission must discourage conduct which undermines public confidence and respect in the sport. *Daly v. Pennsylvania State Horse Racing Commission*, 38 Pa. Commonwealth Ct. 77, 391 A.2d 1134 (1978). Such proscribed conduct "need not be criminal in nature nor proved beyond a reasonable doubt. It is sufficient that the complained-of conduct and its attending circumstances be such as to reflect negatively on the sport." *Id.* at 81, 391 A.2d at 1134 (citation omitted). The Commission's articulation of the burden of proof as entailing a demonstration only of the *appearance* of impropriety thus embodies the purpose of the Act. Such appearances indeed do reflect negatively on the sport and impair the public's perception of its integrity.

We are required to affirm an order of the Commission unless it is not in accordance with the law or is an arbitrary, capricious or unreasonable determination lacking substantial evidence in support of its findings. *Brown v. Pennsylvania State Horse Racing Commission*, 92 Pa. Commonwealth Ct. 497, 499 A.2d 1132 (1985). Substantial evidence, of course, constitutes evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* A reasonable mind could readily conclude that the betting and racing irregularities alleged of petitioner taint the image of that industry. Un-

der the standard of our Supreme Court recently enunciated in *Smith v. Pennsylvania State Horse Racing Commission,* 517 Pa. 233, 535 A.2d 596 (1988), petitioner "voluntarily pursued a course of conduct which was calculated to make at least some members of the public believe that the outcome of races is a product of influences beyond the talent, ability and good fortune of the participants. This activity erodes the public confidence in the industry, and thus frustrates the legislative purpose requiring licensing." *Id.* at 239, 535 A.2d at 599.

Finally, we reject petitioner's contention that Pocono Downs' decision to exclude him from the track abrogates a property interest he possesses in his harness license. According to petitioner, such action would have very nearly the same effect as a license revocation. Suffice it to say in this regard, the instant matter is *not* a license revocation. Any action to terminate petitioner's owner's or trainer's licenses would have to be instituted as a separate proceeding by the Commission.

Accordingly, the order of the Commission is affirmed.

## ORDER

AND NOW, this 22nd day of April, 1988, the Order of the Commission in the above-captioned matter is affirmed.