645 A.2d 933

**BENSALEM RACING ASSOCIATION, Petitioner,**

v.

**STATE HORSE RACING COMMISSION, Respondent.**

**PENN NATIONAL TURF CLUB, INC., Petitioner,**

v.

**STATE HORSE RACING COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 16, 1993.

Decided July 12, 1994.

Reargument Denied Sept. 8, 1994.

---

**16.** Because we must remand, we need not address Petitioners' remaining contentions.

Joseph J. Malatesta, Jr., for petitioner Bensalem Racing Ass'n.

Norman I. White, for petitioner Penn Nat. Turf Club, Inc.

Alan Pincus, for respondent/intervenor.

Before COLINS and FRIEDMAN, JJ., and DELLA PORTA, Senior Judge.

COLINS, Judge.

The Bensalem Racing Association (Bensalem) and the Penn National Turf Club, Inc. (Penn National) petition for review of two separate orders of the Pennsylvania State Horse Racing Commission (PA Commission) which reversed their respective

determinations that pursuant to Section 215(c) of the Race Horse Industry Reform Act (Act),[1] they properly exercised their discretion when they (1) denied Burton K. Sipp (Sipp) the privilege of admission to the grounds, facilities, or enclosures and (2) refused to validate Sipp's racing license (cumulatively, Sipp's ejection).[2] We reverse.

Bensalem and Penn National are corporations licensed to conduct thoroughbred racing and pari-mutuel wagering. Sipp has been a licensed trainer of thoroughbred racehorses in both New Jersey and Pennsylvania for the past thirty years. On December 26, 1984, the PA Commission suspended Sipp, because his license had been suspended by the New Jersey Horse Racing Commission (NJ Commission). Thereafter, the NJ Commission rescinded Sipp's suspension; then, on January 15, 1993, the PA Commission granted Sipp the right to apply for a conditional license to own and/or train thoroughbred horses in Pennsylvania. On January 25, 1993, the PA Commission granted Sipp a conditional trainer's license.

On February 3, 1993, Sipp appeared at Penn National for the purpose of submitting his license for validation. Penn National denied Sipp access to the grounds and validation of his license. Sipp appealed to the PA Commission, which ordered that Penn National's ejection of Sipp be reversed. Subsequently, on April 26, 1993, Sipp again appeared at Penn National for the purpose of submitting his license for vali-

1. Act of December 17, 1981, P.L. 435, *as amended*, 4 P.S. § 325.215(c), which provides:

   A licensed corporation may refuse admission to and eject from the enclosure of the race track operated by the corporation, *any person licensed by the commissions* under section 213, employed at his occupation at the race track, *whose presence there is deemed detrimental to the best interests of horse racing, citing the reasons for that determination . . . .*

   (Emphasis added.)

2. The PA Commission's order regarding Bensalem is dated April 21, 1993, and all references to this adjudication will be prefaced by Bensalem. The PA Commission's order regarding Penn National is dated June 16, 1993, and all references to this adjudication will be prefaced by Penn National.

dation. A Thoroughbred Racing Protective Bureau (TRPB)[3] agent served Sipp with an ejection notice and escorted him off the track. In a written letter addressed to Sipp, Penn National explained that it was ejecting and/or denying admission to Sipp on April 26, 1993, "[d]ue to a record of numerous fines and suspensions both in Pennsylvania and other states and a serious criminal conviction[;] it is obvious that your presence at this racetrack is not in the best interest of racing." (Penn National Finding of Fact No. 18).

Similarly, on February 12, 1993, Sipp appeared at Philadelphia Park for the purpose of submitting his license for validation; Bensalem is the corporate licensee which conducts meets at this site. Bensalem denied Sipp access to the grounds and validation of his license, because Bensalem "concluded that [Sipp] was detrimental to the best interests of horse racing." (Bensalem Finding of Fact No. 12). In a written letter addressed to Sipp, Bensalem explained that it was denying validation of Sipp's license because:

A.   [Sipp] was convicted of witness tampering in the State of New Jersey and sentenced therefor on August 1, 1986.

B.   [Sipp] on numerous occasions violated racing rules when he was an active trainer.

C.   [Sipp] has failed to apply for and receive a license as a trainer in New Jersey.

(Bensalem Finding of Fact No. 13). Sipp appealed both Penn National's and Bensalem's determinations to the PA Commission. In separate orders the PA Commission reversed both Penn National's and Bensalem's ejection of Sipp. Penn National and Bensalem have brought this petition for review.

On appeal to this Court, Bensalem argues that the PA Commission's determination was not supported by any evidence that would allow it to overrule Bensalem's determination that Sipp's presence at the grounds was detrimental to the best interest of horse racing. Specifically, Bensalem

---

**3.** The TRPB is an investigatory agency of the Thoroughbred Racing Association.

argues that pursuant to this Court's holding in *Kulick v. Pennsylvania State Harness Racing Commission*, 115 Pa.Commonwealth Ct. 408, 540 A.2d 620, *petition for allowance of appeal denied*, 520 Pa. 620, 554 A.2d 512 (1988), it properly exercised its discretion to exclude Sipp based on a reasoned determination that Sipp's presence at the facility would be detrimental to the best interest of horse racing. In addition, unlike in *Kulick*, wherein the adverse allegations were speculative, the record in the instant matter is replete with documented violations of criminal laws and racing regulations. Furthermore, pursuant to *Martinez v. State Horse Racing Commission*, 81 Pa.Commonwealth Ct. 1, 472 A.2d 1180 (1984), and with respect to Sipp's tainted history, a licensee's pattern of past conduct is an appropriate factor to consider when determining whether to eject that licensee.

Similarly, Penn National argues that the PA Commission's findings of fact are not supported by any evidence that would allow it to overrule Penn National's determination that Sipp's presence at the grounds was detrimental to the best interest of horse racing. Specifically, Penn National argues that Sipp's record provides more than enough of a basis to support its reasoned determination that his presence is detrimental to the best interest of horse racing. Penn National also argues that there is no evidence to justify disregarding Sipp's past conduct.

In *Kulick*, this Court articulated the following:

At issue in the instant matter is the burden of proof imposed upon a track in support of a determination that the presence of a licensee [2] is detrimental to the best interests of racing. In support of a decision to eject from the track such a licensed person, Section 215(c) of the Act requires nothing more of the corporation than that it cite the reasons upon which its decision is based. . . . The [PA] Commission, in its review, [should] require not that such allegations of impropriety be *proven* but that the track's determination be *reasonable*, a standard which finds support in *Iwinski v. Pennsylvania State Horse Racing Commission*, 85 Pa.Commonwealth Ct. 176, 481 A.2d 370 (1984),

wherein we stated that the 'legal right of [a corporation] to exclude a licensed person from its track depends upon a reasoned determination that his presence there is "detrimental to the best interests of horse racing." ' *Id.* at 179, 481 A.2d at 372 (emphasis deleted).

. . . .

. . . [T]he Act's 'overriding purpose [is] to foster an image of horse racing that would make the image of that "industry" an irreproachable one, even in the eyes of the skeptical public.' To that end, the [PA] Commission must discourage conduct which undermines the public confidence and respect in the sport. *Daly v. Pennsylvania State Horse Racing Commission,* 38 Pa.Commonwealth Ct. 77, 391 A.2d 1134 (1978). Such proscribed conduct 'need not be criminal in nature nor proved beyond a reasonable doubt. It is sufficient that the complained-of conduct and its attending circumstances be such as to reflect negatively on the sport.' *Id.* at 81, 391 A.2d at 1134 (citation omitted). The [PA] Commission's articulation of the burden of proof as entailing a demonstration only of the *appearance* of impropriety thus embodies the purpose of the Act. Such appearances indeed do reflect negatively on the sport and impair the public's perception of its integrity.

We are required to affirm an order of the [PA] Commission unless it is not in accordance with the law or is an arbitrary, capricious or unreasonable determination lacking substantial evidence in support of its findings. *Brown v. Pennsylvania State Horse Racing Commission,* 92 Pa.Commonwealth Ct. 497, 499 A.2d 1132 (1985). Substantial evidence, of course, constitutes evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.*

---

2  Section 213(a) of the Act, 4 P.S. § 325.213(a), states that 'each commission shall license trainers, jockeys, drivers, persons participating in thoroughbred and harness horse race meetings, horse owners and all other persons and vendors exercising their occupation or employed at thoroughbred and harness horse racing meetings....'

*Kulick,* 115 Pa.Commonwealth Ct. at 412 and 414, 540 A.2d at 622 and 623.

■ Sipp was represented by counsel at the hearings before the PA Commission, at which time Penn National and Bensalem attempted to introduced into evidence a TRPB report. At the Penn National hearing, although the PA Commission did not object to the TRPB report being introduced into evidence, Sipp's counsel vigorously objected to its introduction. Sipp's counsel, however, voluntarily relented when reminded by the PA Commission that "under 165.183(f) ... investigative reports of authorized agents of the TRPB shall be deemed to be a part of the official records of the [PA] Commission." At the subsequent Bensalem hearing, neither the PA Commission nor Sipp's counsel objected to the introduction of the TRPB report. Rather, Sipp's counsel feebly argued that although the report was unquestionably a part of the official record, the report contained hearsay and untrustworthy newspaper articles. Nevertheless, this Court notes that on appellate review, it may not usurp an agency's factfinding function. See *Travelers Indemnity Company v. Insurance Department*, 126 Pa.Commonwealth Ct. 41, 558 A.2d 568 (1989). Consequently, as the PA Commission determined that the TRPB report was part of the official record, for all intents and purposes, neither the PA Commission nor Sipp's attorney genuinely contested the authenticity of the factual allegations contained therein.

■ A review of this TRPB report, reveals that since 1968, Sipp has amassed a lengthy history of violations of both the law and the rules of racing. Nevertheless, a summary of some of the more poignant portions of the report follows: [4]

In August of 1968, a thoroughbred trainer sold a horse to a private individual for $3,500; Sipp was the private individual's horse trainer. Thereafter, Sipp demanded a $2,000 kickback on the sale of the horse from the previous trainer, as he declared the horse was only worth $1,500. When the previous trainer refused to acquiesce, Sipp and his brother repeatedly threatened the trainer with bodily injury. Subsequently, the previous trainer received a visit from two

4. As this report is marked confidential, no individuals other than Sipp will be referred to by name.

men at his Monmouth Park barn whereupon he was again threatened with bodily harm; there was at least one witness to this incident. Thereafter, one of Sipp's employees furnished a statement that Sipp was offering $500 to anyone that would 'take care of' the previous trainer. In September of 1968, the trainer filed a complaint in Oceanport County New Jersey's Municipal Court against the Sipp brothers, whereupon the charges were dismissed. Additionally, in September of 1968, Sipp became involved in a verbal altercation with a track veterinarian. Because the veterinarian had scratched one of Sipp's horses for medical reasons, Sipp used foul and abusive language; there were several witnesses. Subsequently, Sipp was fined $200 for using abusive and obscene language to a racing official. Sipp appealed this fine to the NJ Commission whereupon said appeal was denied.

In September of 1970, Sipp applied for a trainer's license at the Blue Bonnets Race Course at which time he failed to admit either to an arrest record or to any adverse racing body rulings. Subsequently, Sipp was permitted to amend his application to include these particular, adverse details.

In 1970, Sipp had been granted an owner's license and a trainer's license in the State of Rhode Island. A review of Rhode Island Racing and Athletics Commissions' files revealed that in his application, Sipp denied both that there had ever been any adverse racing body ruling against him and that he had ever been arrested or charged with a crime. This Commission's Board of Stewards questioned Sipp about his failure to admit to this information on his applications. Sipp answered that he did not think that fines levied by racing bodies constituted adverse rulings and that a $50 fine for fornication was a misdemeanor and did not constitute a crime. Sipp was allowed to amend his applications to reflect adverse, racing body rulings but was not required to amend the applications to reflect any arrest or fines.

In October of 1970, at Lincoln Downs Race Track (Lincoln Downs), information was received from a confidential, reliable source that Sipp had 'hopped' his horses during the

previous summer meetings there. Subsequently, the Lincoln Downs' Stewards were advised and authorized to search Sipp's effects at his barn. The following November, the search was conducted at which time only Sipp's foreman was present. A search of one of Sipp's feeding rooms produced two syringes and a bottle of butazone. A search of the foreman's tack room produced a shoe box found in an old feed barrel which box contained three quantities of horse drugs; the foreman denied any knowledge of the drugs. Thereafter, Sipp admitted that the two syringes found contained a penicillin salve which Sipp alleged he received from a New Jersey veterinarian for treating deep horse leg cuts. With respect to the three drugs, Sipp denied any knowledge thereof and further denied that he had ever injected a racehorse. Subsequent to a hearing before the Board of Stewards, the Stewards ordered: (1) that Sipp be suspended from owning and training horses; and (2) that his case be refereed to the Rhode Island Racing and Athletic Commission for violating Rule 511–A which provided that no person associated with racing shall have control of any hypodermic syringes, needle or other such device that could be used for injection.

In January of 1971, at Lincoln Downs Race Track, two gatemen alleged that when they denied Sipp access to the stable parking area for lack of a permit, Sipp threatened them. Sipp denied the allegation and no resulting action was taken.

In April of 1973, a general agent for the Rhode Island Society for the Prevention of Cruelty to Animals furnished information that he had received an anonymous phone call from a jockey who stated that Sipp had badly beaten a horse at his barn. The caller refused to identify himself because of Sipp's influence.

In January of 1975, Sipp was fined $200 for supervising a horse that was owned by a disqualified person. In February of 1975, Sipp was fined $100 for failure to adhere to the

PA Commission's butazolidin[5] program. In July of 1975, Sipp was fined $100 for entering an ineligible horse at Suffolk Downs Race Track.

In September of 1977, the PA Commission briefly suspended Sipp for failure to comply with the responsibility for insuring proper filing of applications for his owners. In December of 1977 Sipp was fined $100 for forging health certificates which were used to bring two horses into the stable area at the Meadowlands' Garden State Park.

In September of 1979, Sipp was suspended for fifteen days as a result of the drugs phenylbutazone[6] and oxyphenylbutazone[7] having been found in the urine sample of one of his horses. As a result, the PA Commission suspended Sipp for sixty days and fined him $50.

In August of 1980, at the Atlantic City Race Course, a horse was scratched from the second race. The horses's trainer complained to the Stewards that he had not submitted a scratch card. New Jersey State Police investigation revealed that Sipp had executed the scratch card. It was also determined that Sipp owned an interest in the horse which won that second race. In addition, the Racing Form past-performance chart revealed that both Sipp's horse and the scratched horse were contenders for first place. The matter was referred to the New Jersey State Attorney General's Office for presentment to a state grand jury for rigging a publicly exhibited contest. No subsequent action was taken.

In April of 1981, the PA Commission suspended Sipp for sixty days and fined him $1,000 as a result of one of his

5. Butazolidin is a trademark for preparations of phenylbutazone. See footnote 6.

6. Phenylbutazone is an orally administered crystalline powder having analgesic, antipyretic, anti-inflammatory, and mild uricosuric properties. This drug is used especially in the treatment of arthritis, gout, and rheumatoid conditions.

7. Oxyphenylbutazone is an orally administered derivative of phenylbutazone, having similar analgesic, antipyretic, and anti-inflammatory actions. This drug is used especially in the treatment of arthritis, gout, and similar conditions.

horses testing positive for lidocaine[8] at Keystone. In May of 1981, Sipp was fined $250 for entering an ineligible horse at the Atlantic City Race Course. In October of 1981, Sipp was: (1) fined $100 for failure to maintain current, up-to-date records of ownership, sale or transfer, or registration of ownership of his horses at Keystone; and (2) fined $100 for failure to have registration certificates for horses on file at Penn National. In November of 1981, the PA Commission suspended Sipp for failure to pay a fine.

In April of 1982, the PA Commission fined Sipp $250 for failure to conduct his business in a proper fashion. In May of 1982, Sipp was suspended for seven days and fined $250 for entering a horse in a race at Monmouth Park that was disqualified in another jurisdiction without the permission of the Stewards. In August of 1982, Sipp was fined $250 for entering an ineligible horse at Keystone. In November of 1982, the PA Commission: (1) fined Sipp $250 for showing contempt and disrespect and using improper language before the Board of Stewards; and (2) suspended Sipp for failure to pay a fine.

In January of 1983, Sipp was fined $100 for entering an ineligible horse at Keystone. In August of 1983, the Director of Security at Eagle Downs furnished information that the Pennsylvania State Police and the PA Commission were investigating Sipp for possible insurance fraud regarding several horses that had died at Keystone while under Sipp's training. Additionally, in conjunction therewith several insurance companies were conducting their own independent investigations. In September of 1983, this Court upheld Sipp's sixty day suspension and $100 fine in connection with the PA Commission's April 1983 determination that one of Sipp's horses tested positive for lidocaine at Keystone.[9] In December of 1983, a confidential source

8. Lidocaine is a topically administered powder having anesthetic, sedative, analgesic, anticonvulsant, and cardiac depressant activities.

9. See *Sipp v. State Horse Racing Commission,* 77 Pa.Commonwealth Ct. 561, 466 A.2d 296 (1983).

advised the TRPB that the New Jersey State Police were actively involved in investigating Sipp for allegedly destroying three particular horses for the purpose of collecting insurance claims. It was also learned that the TRPB in Maryland had received information from a reliable, confidential source concerning possible insurance fraud involving an owner of a horse which Sipp was training.

In January of 1984, a reliable, confidential source advised a TRPB agent at Keystone that the New Jersey State Police were assisting the Burlington County Prosecutor's office in its investigation of Sipp. The investigation pertained to Sipp allegedly forging several horsemen's checks to purchase horses. During the course of the investigation, reliable information was received that Sipp was destroying horses which he was training for the purpose of collecting insurance claims; in conjunction therewith several insurance companies were conducting their own independent investigations. In the latter part of 1984, a Burlington County New Jersey grand jury indicted Sipp and charged him with defrauding insurance companies regrading claims paid for nine horses that died while under his care.[10] Additionally, Sipp was charged with theft by deception, attempted theft by deception, and failure to make proper disposition of property. As a result, the NJ Commission suspended Sipp. Subsequently, the PA Commission advised Sipp that his license had been suspended in Pennsylvania due to the fact that he was under suspension in New Jersey.

In April of 1985, Sipp was arrested for witness tampering in connection with the ongoing insurance fraud investigation; Sipp had allegedly asked the witness' lawyer to have his client change his testimony in return for money. In June of 1986, Sipp entered a guilty plea to one count of witness tampering with the Burlington County Prosecutor's office. In return the prosecutor's office agreed to drop all

10. Apparently, Sipp had submitted claims for insurance payments based on inflated values for the horses.

other pending charges.[11]   As a result, the Burlington County Superior Court sentenced Sipp to five years probation and fined him $7,500, the maximum amount allowed by New Jersey state law.   Subsequently, the matter was referred to the PA Commission for administrative action.

In June of 1990, Sipp was indicted by a Burlington County New Jersey grand jury on charges of deceptive business practices and attempted theft by deception.   It was alleged that in September of 1988 Sipp had staged a burglary at his Springfield pet store so that he could collect insurance money on two exotic, breeding birds which he claimed were stolen.   It was determined that Sipp had given the two birds to a friend in Virginia and then collected the insurance money;  Sipp claimed each bird was worth $1,000. Sipp thereafter returned the money when he found out that his friend had contacted the New Jersey State Police regarding the matter.

This Court acknowledges that the PA Commission argues that it should not be required to pore over a lengthy TRPB transcript to unearth those parts which allegedly support a reasoned determination that Sipp's presence is detrimental to the best interest of horse racing.   In addition, this Court acknowledges that the PA Commission argues that the TRPB report contains newspaper articles and other items that are substantially of a hearsay nature.   This Court emphasizes, however, that the facts regarding Sipp's numerous criminal convictions have never been contested by any party to the proceeding, at any stage of the proceeding, including oral argument.[12]   Furthermore, the convictions provide a reasonable basis for Bensalem's and Penn National's respective determinations to eject Sipp from their grounds.   Finally, this

11.  The Burlington County Prosecutor's office stated that they agreed to the plea bargain simply because their primary goal was to remove Sipp from the New Jersey racing industry.

12.  At its hearings, the PA Commission maintained that the TRPB report, and everything contained therein, was a part of the official record.   Additionally, in its respective adjudications on the instant matter, the PA Commission never intimated that the TRPB report was not a part of the official record.

Court agrees with the PA Commission that Part C of Bensalem's letter denying Sipp validation of his license is irrelevant to the instant proceeding.

We conclude that the uncontested facts in this matter require no further explanation; Bensalem and Penn National reasonably exercised their respective discretion based upon the uncontested facts. Allowing Sipp to train and race thoroughbred horses at the respective tracks is detrimental to the best interest of horse racing. Furthermore, in light of Sipp's extensive record and pursuant to *Kulick*, a reasonable mind could readily conclude that Sipp's association with horse racing not only taints the image of that industry but also fosters a tawdry image of that industry. Sipp voluntarily pursued a course of conduct which erodes public confidence in the industry and frustrates the legislative purpose requiring licensing. *Kulick*. Moreover, this Court acknowledges that Sipp's record is so deplorable that there was clearly a reasonable justification for Bensalem's and Penn National's ejection of Sipp. Based on Sipp's uncontested record of prior convictions and egregious past acts, as well as a review of the respective determinations that Sipp's presence will be detrimental to the best interest of horse racing, Bensalem's and Penn National's ejection of Sipp was clearly a reasonable exercise of their discretion.

Accordingly, we reverse.

## ORDER

AND NOW, this 12th day of July, 1994, the orders of the Pennsylvania State Horse Racing Commission in the above-captioned matters are reversed.

FRIEDMAN, J., concurs in the result only.