# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eduardo E. Rojas,                               :
                        Petitioner              :
                                                :
            v.                                  :    No. 1256 C.D. 2017
                                                :    Argued:  December 4, 2017
Pennsylvania State Horse Racing                 :
Commission (Department of                       :
Agriculture),                                   :
                        Respondent              :


BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
            HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE J. WESLEY OLER, JR., Senior Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED:  March 1, 2018**


Eduardo E. Rojas (Petitioner) petitions for review of an Order of the
Pennsylvania State Horse Racing Commission (Commission), Department of
Agriculture, which affirmed his ejection from Penn National Race Course (Penn
National) pursuant to Section 9326 of the Agriculture Code, 3 Pa. C.S. § 9326,[1]

---

[1] Section 9326(a) provides, in pertinent part, that:

> [A] licensed racing entity may refuse admission to and eject from the racetrack
> enclosure operated by the licensed racing entity any person licensed by the
> [C]ommission under this chapter and employed at an occupation at the racetrack if
> the person's presence is deemed detrimental to the best interests of horse racing and
> after citing the reasons for the determination in writing.

which is commonly called the Race Horse Industry Reform Act.[2] For the reasons set forth below, we vacate the Commission's Order and remand the matter for a new hearing.

Petitioner is a licensed thoroughbred horse trainer within the Commonwealth of Pennsylvania. On July 6, 2017, Petitioner received a Notice of Ejection from Penn National that stated it was permanently ejecting Petitioner from its race track:

> following the June 30, 2017 conviction of his wife, Murray Rojas, on multiple counts of misbranding of prescription drugs in violation of 21 U.S.C. §[ ]353(f)(1)(C). In light of this conviction and the Rojas' history of transferring horses back-and-forth between each other creates [sic] a negative perception of racing and pari-mutuel racing at Penn National and undermines and puts at risk the integrity and reputation of racing and pari-mutuel wagering in general as embodied at 58 Pa. Code §[ ]163.60.[3]

(Reproduced Record (R.R.) at 119a.)

The ejection letter further stated that the above conduct violated Penn National's Horsemen's Guide, which sets forth the following standards of conduct:

B. Dishonest, Offensive or Illegal Conduct

While criminal activity is clearly outside the scope of permissible conduct, and persons who engage in criminal activity will be subject to the appropriate legal actions, the standards of behavior for Racing Participants are considerably higher than merely avoiding conviction of a crime. Instead, persons must conduct themselves in a way that is not

---

3 Pa. C.S. § 9326(a). The overarching purpose of the statute governing horse racing is to "foster an image of horse racing that would make the image of that 'industry' an irreproachable one, even in the eyes of the skeptical public." *Helad Farms v. Pa. State Harness Racing Comm'n*, 470 A.2d 181, 184 (Pa. Cmwlth. 1984).

[2] Act of October 28, 2016, P.L. 913, 3 Pa. C.S. §§ 9301-9374.

[3] This regulation provides that "[d]isqualification of one spouse applies to the other only if it can be demonstrated that the horses owned or controlled by the disqualified spouse are also under the ownership or control of the spouse who has not been disqualified." 58 Pa. Code § 163.60.

only "lawful," but that also promotes a high degree of Integrity within the industry. Persons who fail to live up to this standard are subject to sanctions by the Racetrack. By way of example only, and not intended as an exclusive list, the following activities are prohibited (whether within or outside of the Racetrack grounds):

- Criminal offenses of any kind;
- Violent or threatening behavior;
- Conduct that creates a negative public perception of [Penn National] or the Racetrack;
- Conduct that undermines or puts at risk the integrity and reputation of the pari-mutuel wagering and gaming industry in general;
- Violation of the Racetrack's safety policies or rules;
- Failure to comply with the lawful directions of authorized Racetrack representatives; and
- Misrepresentation in any application or form or other disclosure statements made to the Racetrack or to any governmental regulatory body.

(R.R. at 119a-20a (quoting 2017 Horsemen's Guide, at 6 Hr'g Tr., Ex. 2)).) According to the ejection notice, Petitioner's conduct was a detriment to racing at Penn National. (*Id.* at 120a.)

Petitioner timely appealed this ejection to the Commission, which held a hearing on July 26, 2017. Eric Johnston, director of racing operations at Penn National, was the sole witness for Penn National. Petitioner did not testify or present any witnesses.

Following the hearing, the Commission issued Findings of Fact, which included, in pertinent part, the following:

11. On March 29, 2015, trainer Murray Rojas transferred her entire stable to her husband, [Petitioner]. A total of 32 horses.

12. Mr. Johnston testified that on March 29, 2015, that [sic] the FBI sent "target letters" to approximately 40-50 trainers in the stable area looking at their records and possible indictments.

3

13. Mr. Johnston testified that on July 26, 2017,[4] [Petitioner] transferred 20 horses back to his wife Murray Rojas because of personal issues between them.

14. On August 12, 2015, Murray Rojas authorized the transfer of twelve (12) horses to [Petitioner].

15. On August 12, 2015, the [U.S.] Attorney's Office indicted Murray Rojas on charges of wire fraud and conspiracy to administer drugs to horses on race day.

16. Mr. Johnston testified that he took the transfer of horses back and forth between Murray Rojas and [Petitioner] into consideration when he drafted the July 6, 2017 Ejection since it was difficult for Penn National to define a separation of operations between them.

17. Mr. Johnston testified that [Petitioner]'s conduct of transferring horses back and forth with Murray Rojas created a "negative public perception" of Penn National and "undermines or puts at risk the integrity and reputation of the pari-mutuel wagering and gaming industry in general" and formed the basis of the ejection.

\* \* \*

21. Mr. Johnston reviewed the trainer profiles for Mr. and Mrs. Rojas: Murray Rojas starts: in 2007 – 628 starts; in 2008 – 565 starts; in 2009 – 511 starts; in 2010 – 543 starts; in 2011 – 507 starts; in 2012 – 450 starts; in 2013 – 401 starts; in 2015 – 87 starts; in 2016 – 0 starts; in 2017 – 0 starts[];
[Petitioner] starts: in 2007 – 0 starts; in 2008 – 0 starts; in 2009[ –]0 starts; in 2010 – 0 starts; in 2011 – 0 starts; in 2012 – 0 starts; in 2013 – 0 starts; in 2014 – 2 starts; in 2014 – 335 starts; in 2015 – 169 starts; in 2016 – 199 starts; in 2017 [–] 114 starts.[5]

22. Mr. Johnston reviewed the 2015 calendar year performance by horse and by start for Murray Rojas and [Petitioner] and determined that in 2015 "there was a lot of crossover in horses that were in

---

[4] The actual date of transfer was July 26, 2015, not July 26, 2017. (*See* R.R. at 40a-41a, 115a-16a.)

[5] There also appears to be an error in the number of starts in 2014. The evidence shows Murray Rojas had 335 starts in 2014, and Petitioner had just 2 starts in 2014. (R.R. at 46a-49a.)

4

Murray Rojas' care being run right back under [Petitioner]'s care," which corresponded with earlier horse "transfers."

23. Mr. Johnston testified that 23 of 35 horses that Murray Rojas ran in 2015 were also run by [Petitioner]. In 2015, 67 of 87 starts were common horses between Murray Rojas and [Petitioner].

24. In 2015, [Petitioner] ran 45 horses that year, 23 of which were common horses between [Petitioner] and Murray Rojas.

25. [Petitioner] had 169 starts in 2015 – 115 of those starts were common horses also started by Murray Rojas that same year.

\* \* \*

27. In August 2015, after Murray Rojas transferred her horses back to [Petitioner], the foal certificate records[6] indicate that Murray continued to access those specific horse's [sic] files.

28. Mr. Johnston testified that after the federal jury verdict on June 30, 2017, Murray "cleaned out the balance of the foal certificates" for horses in the files. Mr. Johnston testified that even after Murray Rojas' conviction[,] "she came in and picked up foal certificates and was doing work for Eddie [Petitioner]."

29. After her conviction on June 30, 2017, on July 4 and 5, 2017, Murray Rojas removed the foal certificates of 36 horses from the "Foal Certificate" list. Five (5) of those horses had been previously run by Murray Rojas and by [Petitioner] in 2015.

\* \* \*

31. Penn National Exhibit 9 indicates that:

- On June 1, 2017, the #5 horse (Chapel of Love) was entered for Trainer [Petitioner] and saddled by "his wife" [–] Murray Rojas;
- On June 8, 2017, the #3 horse (Jolly's Calling) was trained by [Petitioner] and saddled by his wife Murray Rojas;

---

6 "[F]oal certificate[s] reflect who has possession of a specific horse." (Comm'n Adjudication, Findings of Fact (FOF) ¶ 26.)

5

- On June 9, 2017, the #2 horse (Wolfie) was trained by [Petitioner] and saddled by his wife Murray Rojas;
- On June 10, 2017, the #11 horse (I'm Perfection) was trained by [Petitioner] and saddled by his wife Murray Rojas;
- On June 21, 2017, the #4 horse (Toss the Tub) was trained by [Petitioner] and saddled by his wife Murray Rojas.

32. [Petitioner] had 9 starts in June [2017] – Murray Rojas saddled five (5) of those horses.

33. Mr. Johnston testified that these records strengthened the decision to eject [Petitioner] because there was no separation between the [Petitioner] and Murray Rojas.

34. On June 9, 2017[,] the horse named Wolfie trained by [Petitioner] won the 3rd Race. The winning photograph of the "winners circle" does not depict [Petitioner], but depicts Murray Rojas.

35. On August 12, 2015, following the initial indictment of Murray Rojas, Penn National officials met with Murray Rojas and [Petitioner] to come to an agreement regarding the participation of Murray in [Petitioner]'s training business.

36. Penn National sought an Agreement by the Rojas[es] to keep a complete separation of duties between Murray Rojas and [Petitioner].

37. Murray Rojas and [Petitioner] did not sign the proposed agreement between the parties.

38. On August 12, 2015, the U.S. Attorney's Office issued a press release indicating that trainer Murray Rojas[] had been indicted for wire fraud and conspiracy to administer prohibited substances to horses on race day.

39. On June 2, 2016, the U.S. Attorney's Office issued a press release indicating that additional criminal charges were being brought against trainer Murray Rojas[] for 21 counts of wire fraud and conspiracy to administer prohibited substances to horses on race day.

40. On July 5, 2017, the U.S. Attorney's Office issued a press release announcing the June 30, 2017 conviction of Murray Rojas on 14 felony counts for misbranding prescription drugs, conspiracy[,] and the administration of prohibited drugs to horses on race day.

41. Mr. Johnston testified that the press releases identified the "trainer" [Murray Rojas] as being from Penn National or being associated with Penn National[, which] is detrimental to Penn National's gaming and racing license. [(Second alteration added.)]

42. Mr. Johnston testified that press releases, and press reports and public comments create the general perception that "racing is less than honest" and those perceptions affected the decision to eject [Petitioner]. Mr. Johnston concluded that no one can prove that [Petitioner] and Murray Rojas are not acting as one operation.

\* \* \*

44. Mr. Johnston, on cross-examination, testified that the horse transfers were all proper and approved by the stewards.

45. Penn National demonstrated no violation of any racing regulation or any conviction by [Petitioner].

\* \* \*

47. Five (5) horses currently trained by [Petitioner] were previously trained by Murray Rojas.

48. Mr. Johnston testified that [Petitioner] has not shown separation between he [sic] and Murray Rojas and that they still operated as one even in June [of 2017] when Murray saddled [Petitioner]'s horses and Murray picked up the foal certificates. [(First and third alterations added.)]

49. [Petitioner] presented no testimony or documentary evidence at the July 26, 2017 hearing.

50. On July 6, 2017, the Commission, through the Bureau of Thoroughbred Horse Racing, issued Ruling No. 17053C permanently revoking the owners/trainers' licenses of Murray Rojas based upon her June 30, 2017[] conviction on 14 felony counts for conspiring with three veterinarians to have drugs

administered on race day; [and] backdating invoices and records with the intent to defraud and mislead the Commission.

(Comm'n Adjudication, Findings of Fact (FOF) ¶¶ 11-17, 21-25, 27-29, 31-42, 44-45, 47-50 (citations omitted).)

Based upon these facts, the Commission concluded that:

Documentary evidence of [Petitioner]'s continuous and ongoing conduct, racing transactions and business relationship and association with a trainer (regardless of marital status) who was indicted and ultimately convicted of 14 felony counts of misbranding prescription drugs for horses on race day and conspiring with three veterinarians to have drugs administered to horses on race day, supports Penn National's decision that [Petitioner]'s presence at Penn National is inconsistent with the best interests of racing or the orderly conduct of the race meeting at Penn National.

(*Id.*, Conclusion of Law ¶ 9 (citations omitted).) In reaching this conclusion, the Commission explained that the evidence presented by Penn National "clearly demonstrated the ongoing business connection between Murray Rojas and [Petitioner]." (Comm'n Adjudication at 19.) It dismissed Petitioner's argument that the transfers between Murray Rojas and Petitioner were approved by the Board of Stewards (Stewards), stating:

[w]hile that aspect maybe [sic] true, [Petitioner] fails to grasp that the continuous transfer of horses and the running of the very same horses back and forth between Murray Rojas and [Petitioner] certainly generated the appearance of a joint business enterprise. . . . Standing alone, each piece of documentary evidence might not be sufficient to support Penn National's ejection of [Petitioner;] however, taken as a whole, the records demonstrate to this Commission a seamless pattern of business between Murray [Rojas] and [Petitioner] such that could create a negative public perception. This determination is not taken lightly.

8

(*Id.* at 20.)

Further, the Commission found that, although it took no action in relation to Petitioner's license, that did "not alter Penn National's statutory authority to exercise its private property rights." (*Id.* at 21.) Finally, the Commission concluded Petitioner's marital status to Murray Rojas was irrelevant because it "would conclude that [Penn National]'s ejection was reasonable even if Murray Rojas and [Petitioner] were **not** married." (*Id.* (emphasis in original).) Although the Commission affirmed Penn National's decision to eject Petitioner, it modified the decision by reducing the ejection from permanent in duration to a term of 1,095 days (3 years). (*Id.* at 21-22, Comm'n Order.)

On September 8, 2017, Petitioner filed a timely Petition for Review (Petition).[7] On appeal,[8] Petitioner contends the Commission abused its discretion in finding he was a detriment to racing based upon what was specifically charged in the ejection letter and that his due process rights were violated when the Commission relied upon a "joint business enterprise" theory to uphold the ejection, a theory that was not charged and, even if it was, is not prohibited. In addition, Petitioner argues there is not substantial evidence to support the Commission's finding that he is a detriment to racing and that the Commission improperly shifted the burden of proof

---

[7] Petitioner also filed an Application for Stay Pending Appeal (Application for Stay) and Application for Expedited Stay Decision and for Advancement of Argument (Application to Expedite) on October 16, 2017. The Application to Expedite was granted in part and argument on the Application for Stay was held via teleconference on October 26, 2017. The Court subsequently granted Petitioner's Application to Expedite argument on his Petition by Order dated October 30, 2017, which scheduled argument on the merits of his Petition for the December term. By Order dated November 9, 2017, the Court denied his Application for Stay.

[8] On appeal, "[w]e are required to affirm an order of the Commission unless it is not in accordance with the law or is an arbitrary, capricious or unreasonable determination lacking substantial evidence in support of its findings." *Kulick v. Pa. State Harness Racing Comm'n*, 540 A.2d 620, 623 (Pa. Cmwlth. 1988).

9

to him instead of Penn National. Finally, in his brief, he argues the Commission violated its own regulations by having only one member sign the adjudication, not two, rendering the Commission's decision a nullity.

The Commission argues that Penn National had express statutory authority to eject Petitioner from its racetrack once it deemed him a detriment to racing. All that Penn National needed to show was that the reason for ejecting Petitioner was reasonable. Based upon the evidence presented by Penn National, which was unrebutted, the Commission argues there was ample evidence to find the ejection was reasonable. It also contends the ejection notice was proper and Petitioner knew or had reason to know that his association with Murray Rojas was the true issue as it was raised as a concern long before his actual ejection. The Commission disputes that the burden of proof was wrongfully placed on Petitioner and insists it was on Penn National. Finally, it maintains the Adjudication and Order was unanimously voted upon by the nine-member Commission and is consistent with the law.

Penn National[9] stresses its right as a private-property owner to eject persons from its track who are detrimental to racing, even if the person remains licensed by the Commission. It notes, like the Commission, that it merely needs to make a reasoned determination based upon an appearance of impropriety. Based upon the evidence it presented, including the transfer of horses between the Petitioner and Murray Rojas, the fluctuating statistics, the number of common horses, and Murray Rojas's continued access and involvement with Petitioner's training activities, even after her indictment, Penn National argues there is more than substantial evidence to support its decision to eject Petitioner. Penn National also argues that Petitioner's conduct need not be criminal in nature or even violate a specific racing rule or

_____

[9] Penn National Turf Club, LLC and Mountainview Thoroughbred Racing Association, LLC, intervened in this action and are referred to throughout as "Penn National."

10

requirement; it merely needs to create an appearance of impropriety, which the continued close association certainly created. Penn National maintains its notice of ejection was proper, as was the Commission's final Adjudication and Order.

Because it raises a threshold question implicating the Court's jurisdiction, we begin with Petitioner's argument that the Commission violated its own regulations by having only one member sign the adjudication, not two, rendering the Commission's decision a nullity. In support thereof, Petitioner cites 58 Pa. Code § 165.184(a), which provides in pertinent part that "[a] final order or adjudication shall be signed and approved by two members of the Commission who shall have the right to enter the final order or adjudication based upon the record made at the hearing or hearings conducted by the Commission."

The Adjudication and Order here is signed only by Russell C. Redding, Chairman of the Commission. As the Commission points out, the regulation at issue, 58 Pa. Code § 165.184(a), was promulgated in 1969 under the former statute, which was repealed and replaced by the Race Horse Industry Reform Act. The new statute specifically provides that all rules and regulations previously promulgated "remain in effect except to the extent that they are in direct conflict with this chapter." Section 9311(h)(1) of the Race Horse Industry Reform Act, 3 Pa. C.S. § 9311(h)(1). Here, the regulation is in direct conflict with the current statute. Under the current statute, there are nine voting commissioners and actions of the Commission require a simple majority vote. 3 Pa. C.S. § 9311(b), (f)(1). Under Section 201(a) of the prior act, there were only three commissioners. Act of December 17, 1981, P.L. 435, *as amended*, *formerly* 4 P.S. § 325.201(a), *repealed by* Section 5(f) of the Act of February 23, 2016, P.L. 15. The regulation requiring an adjudication to be signed and approved by two members necessarily conflicts with the current statute because

otherwise two commissioners could bind the nine-member Commission, despite the statute specifically requiring more. In addition, the Adjudication was in accordance with the new procedures the Commission adopted to govern hearings related to ejections, which simply require the decision be made at the close of the hearing and a written adjudication supporting the decision be issued within 15 days of the decision.[10] It was not reversible error for the Adjudication to contain the signature of only the Chairman of the Commission acting on behalf of the commissioners present at the hearing, who unanimously agreed with the decision.

We next turn to Petitioner's claim that the Commission abused its discretion in finding he was a detriment to racing based, not upon the allegations charged in the ejection notice but instead upon an allegation not charged: his alleged operating as "one business enterprise" with Murray Rojas. By going outside of the allegations charged by Penn National, Petitioner claims he was denied due process.

"In an administrative hearing, due process requires, at a minimum, notice and the opportunity to be heard." *Vaders v. Pa. State Horse Racing Comm'n*, 964 A.2d 56, 58 (Pa. Cmwlth. 2009). Here, Petitioner did receive notice and a hearing. However, the Notice of Ejection does not specifically contain an allegation that Petitioner operated "one business enterprise" with Murray Rojas, the offense that the Commission relied upon in upholding Petitioner's ejection. The July 6, 2017 Notice of Ejection states that Petitioner was being permanently ejected from Penn National:

> following the June 30, 2017 conviction of his wife, Murray Rojas, on multiple counts of misbranding prescription drugs . . . . In light of this conviction and the Rojas' history of transferring horses back-and-forth between each other creates a negative perception of racing and pari-

---

[10] A copy of the new procedures is available in the Joint Supplemental Record at pages 42b-47b. The Commission's new procedures were published in the Pennsylvania Bulletin on June 3, 2017, and were served on Petitioner along with the Notice of Hearing. (*Id.* at 36b.)

12

mutuel racing at Penn National and undermines and puts at risk the integrity and reputation of racing and pari-mutuel wagering in general as embodied in 58 Pa. Code §[]163.60.

(R.R. at 119a.)

The Commission and Penn National claim that it was apparent from the start of the hearing that Petitioner's association with Murray Rojas was at issue, and that Petitioner did not object. While it is true that Petitioner's association with Murray Rojas was a common theme throughout the hearing, this alone is not adequate. The Notice of Ejection did not provide notice that his association with Murray Rojas was at issue, or charge him with operating as "one business enterprise," and referenced just the transfer of horses between the two. We, therefore, cannot say that Petitioner was apprised of the charges against which he needed to defend himself. As a result, his due process rights were violated.

Petitioner requests that the Order of the Commission be reversed, the ejection notice be vacated, and all rights, benefits, and privileges he previously held be restored. However, "[i]t is axiomatic that a violation of a party's right to due process does not entitle an aggrieved defendant to dismissal of the claim." *Wilkins Twp. v. Wage Policy Comm. of Wilkins Twp. Police Dep't*, 162 A.3d 581, 588 (Pa. Cmwlth. 2017). If notice is inadequate, "the remedy is a remand for an additional hearing after a new notice." *Caba v. Weaknecht*, 64 A.3d 39, 66 (Pa. Cmwlth. 2013).

Accordingly, we vacate the Commission's determination and remand for a new hearing after new notice.[11]

---

[11] Given our disposition, we need not reach Petitioner's remaining issues.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eduardo E. Rojas,                                    :
                              Petitioner             :
                                                     :
                    v.                               :     No. 1256 C.D. 2017
                                                     :
Pennsylvania State Horse Racing                      :
Commission (Department of                            :
Agriculture),                                        :
                              Respondent             :

# **O R D E R**

**NOW**, March 1, 2018, the Order of the Pennsylvania State Horse Racing Commission (Commission), in the above-captioned matter, is **VACATED, and the matter is REMANDED** to the Commission for further proceedings.

Jurisdiction relinquished.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eduardo E. Rojas,              :
           Petitioner         :
                                    :
         v.                    :    No. 1256 C.D. 2017
                                    :    Argued: December 4, 2017
Pennsylvania State Horse Racing     :
Commission (Department of Agriculture), :
         Respondent      :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE J. WESLEY OLER, JR., Senior Judge

<u>OPINION NOT REPORTED</u>

DISSENTING OPINION
BY PRESIDENT JUDGE LEAVITT              FILED: March 1, 2018

Respectfully, I dissent.

I agree with the majority that Eduardo Rojas[1] had no notice of Penn National's newly articulated reason for ejecting him from its racetrack and, thus, was denied due process. I disagree, however, with the majority's decision to remand the matter to give Penn National a second chance to prove its case. Because Penn National did not make its case against Rojas on its own written charges, the Commission's adjudication should be reversed.

On July 6, 2017, Penn National sent Rojas a Notice of Ejection, which stated:

> Mr. Eduardo Rojas is hereby permanently ejected from Penn National Race Course ("Penn National") following the June 30, 2017 conviction of his wife, Murray Rojas, on multiple counts of misbranding prescription drugs in violation of 21 U.S.C. §353(f)(1)(C). In light of this conviction and the Rojas' [sic]

---

[1] Rojas is a horse trainer.

history of transferring horses back-and-forth between each other creates a negative perception of racing and pari-mutuel racing at Penn National and undermines and puts at risk the integrity and reputation of racing and pari-mutuel wagering in general as embodied in 58 Pa. Code §163.60.

Reproduced Record at 119a (R.R. __).  Rojas appealed the ejection to the Commission and came to the hearing prepared to defend the two very specific charges Penn National listed in its notice:  (1) Rojas' wife's recent conviction; and (2) horse transfers between Rojas and his wife.

On the first charge, Rojas asserted that his wife's conviction could not be attributed to him without evidence that implicated him in her criminal misconduct.  None was offered by Penn National.  On the second charge, Rojas produced evidence that each transfer of horses had been specifically approved by the Commission.

At the hearing Penn National effectively dropped these two charges. Instead, it pursued a new charge that Rojas' wife operated as his "alter ego" in a single business enterprise.  Notes of Testimony, 7/26/2017, at 39; R.R. 43a.  Rojas repeatedly objected to this evidence as wholly irrelevant to the written charges on which Penn National based its ejection.  Rojas had every right to believe the Commission would sustain his relevancy objections and reverse his ejection when Penn National provided no evidence to support the charges in its ejection notice. Instead, the Commission created its own due process violation by upholding Rojas' ejection on the basis of Penn National's newly claimed "one business enterprise" theory.[2]

---

[2] Even if Rojas received adequate notice of the "one business enterprise" theory, Penn National failed to carry its burden on that charge.  Its key piece of evidence was a family picture showing Murray Rojas standing beside one of her husband's winning horses.  R.R. 121a.  Other proffered evidence consisted of commission-approved horse transfers between Murray and Eduardo Rojas,

The majority holds that a remand is the proper remedy where due process rights are violated by reason of an agency's inadequate notice. *Caba v. Weaknecht*, 64 A.3d 39, 66 (Pa. Cmwlth. 2013). However, the Commission did not issue the notice; rather, the notice came from a private third party, Penn National. Moreover, Penn National's notice was not "deficient" as to the listed charges. It was plain: the ejection was based on (1) Rojas' wife's recent conviction; and (2) horse transfers between Rojas and his wife. Penn National simply failed to make its case on those listed charges.

The purpose of a remand is not to give a party who has failed to sustain its evidentiary burden a second chance. *Williams v. Bonair Foundry Co.*, 257 A.2d 69, 72 (Pa. Super. 1969). Repeatedly, this Court has held that we will not remand to give a party "the proverbial second bite at the apple" and will not allow a party to present evidence that was available, or could have been available, at the time of the first hearing. *Primecare Medical, Inc. v. Unemployment Compensation Board of Review*, 760 A.2d 483, 488 (Pa. Cmwlth. 2000). Because Penn National has failed to provide any admissible evidence to support its charges, the Commission erred as a matter of law in upholding the ejection.

Accordingly, instead of remanding for a do-over by Penn National, I would reverse.

_____
MARY HANNAH LEAVITT, President Judge

---

and a website printout of their individual starts in thoroughbred races over several years. R.R. 112a-118a; Supplemental Reproduced Record at 8b-35b. These pieces of circumstantial evidence fall short of proving that Rojas and his wife were operating one business enterprise. Penn National offered no direct or documentary evidence to support its business enterprise theory.

MHL-3